AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
etc., et al., Plaintiffs,

v.

Martin R. HOFFMANN et al.,
Defendants.

Civ. A. No. 75–G–0652–NE.

United States District Court,
N. D. Alabama,
Northeastern Division.

Aug. 13, 1976.

David Blankenship, C. Lynwood Smith, Jr., Hornsby, Blankenship, Higgs & Smith, Huntsville, Ala., for plaintiffs.

Wayman G. Sherrer, U.S. Atty., B. Jack Rivers, Asst. U.S. Atty., Birmingham, Ala., Capt. R. Craig Lawrence, JAGC HQDA (DAJA–LTC), Capt. Paul C. Besozzi, JAGC BMDPO, Washington, D.C., for defendants.

E. Cutter Hughes, Jr., John M. Heacock, Jr., Lanier, Shaver & Herring, Huntsville, Ala., for Brown Engineering Co., amicus curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

Petitioners contended in substance that a reorganization and a resulting reduction-in-force (RIF) among the Civil Service personnel at the Ballistic Missile Defense Systems Command (BMDSCOM) in Huntsville, Alabama violated Bureau of the Budget, now

and hereinafter known as Office of Management and Budget (OMB) Circular No. A–76, Department of Defense (DOD) Directives 4100.33 and 4100.15, Army Regulation (AR) 235–5, Section XXII of the Armed Services Procurement Regulations (ASPR), and other provisions of civil service regulations. The violations allegedly occurred when BMDSCOM entered three private contracts with M & S Computing, Incorporated (M & S), Contract Number DASG60–74–C–0026,[1] Science Applications, Incorporated (SAI), Contract Number DAHC60–72–C–0092 and Teledyne-Brown Engineering Company (Teledyne-Brown), Contract Number DAHC60–73–C–0012. The first two contracts are in support of the SAFEGUARD BMD System deployed in North Dakota. The Teledyne-Brown contract for systems engineering and technical analysis (hereinafter known as the SETAC) is in support of a BMD research and development program currently known as the Systems Technology Program (STP). Petitioners contend that these contracts provided jobs for contractor personnel which should have been potentially available to them in the face of the RIF through "bump" and "retreat" rights established by the United States Civil Service Commission regulations.

On June 18, 1975 this court issued a preliminary injunction halting the U.S. Army from implementing the RIF at BMDSCOM. This court's opinion in that matter was reported at 398 F.Supp. 176. After certifying this matter as a class action on December 30, 1975, the court on January 30, 1976, took under advisement the defendants' motion for summary judgment. On 2–6 and 9–12 February 1976 the court conducted a trial on petitioners' application for a permanent injunction and respondents' opposition thereto. In light of the extensive factual presentation made by all the parties at that time the court, while being inclined to grant the defendants' motion for summary judgment, bases its decision on the facts as

presented. Therefore, the defendants' motion for summary judgment is rendered moot. In light of the comprehensive evidence offered by defendants at trial, much of which had not been fully presented at the prior hearings, the court has reexamined its position on the issues raised by all parties and concludes that it must find for the defendants. For the reasons which follow the preliminary injunction is hereby dissolved, judgment is entered for the defendants and the cause is dismissed.

## FINDINGS OF FACT

### I. INTRODUCTION

The individual named plaintiffs are Civil Service employees at BMDSCOM and will be affected by the proposed RIF. Plaintiff American Federation of Government Employees (AFGE) is the recognized bargaining agent for the Civil Service employees at BMDSCOM.

The defendants in this case are the Secretary of the Army and the Commanding Officer of BMDSCOM, a subordinate command of the Ballistic Missile Defense Organization (BMDO).

BMDSCOM scheduled a reorganization and consequent RIF to take effect there on May 23, 1975. Of the 296 permanent Federal civil servants to be affected approximately 67 employees were to be finally separated, approximately 7 were to retire under discontinued service retirement, approximately 20 others were to retire, approximately 93 were to be reassigned in their GS grade, approximately 56 were to be transferred, approximately 3 were to resign, and approximately 50 others were to be finally demoted.

The reorganization and RIF flow from the Strategic Arms Limitation (SAL) Agreements, subsequent Congressional actions, and the judgment of the BMDO management that this reorganization reflects the reduced personnel needs of this nation's BMD efforts. Through the good faith ef-

---

1. Based on the evidence presented by defendants the court must find that the M & S contract expired on June 30, 1976. Since the plaintiffs have made no ʼowing that this con-

tract would be extended beyond that date their contentions regarding the M & S effort are mooted by its termination.

forts of both parties the size of the class has been reduced from the initial total of 296 to a present total of 42, made up of 17 terminations, 23 downgrades, and 2 lateral reassignments.

## II. THESE BMD PROGRAMS ARE INTEGRALLY INVOLVED WITH U.S. FOREIGN POLICY AND DEFENSE OBJECTIVES

BMD as a concept in and of itself involves highly complex and technical elements. The basic task of any BMD system is to detect, track, intercept and destroy incoming enemy ballistic missiles (TT 685–87) [2]. To accomplish this job it uses tracking radars and interceptor missiles. The Army and private industry started developing BMD system concepts and hardware in the mid-1950's (TT 688, 694). These efforts ranged from initial and follow-on research and development work leading to the deployment of the SAFEGUARD System from 1970–75 as well as other research and development efforts such as those currently reflected in the STP. (Defendants' Exhibit 5). The SAFEGUARD BMD System consists of two highly sophisticated radars and two types of interceptor missiles joined together by advanced data processing equipment which permits the system to track and intercept incoming ballistic missiles. The STP, formerly known as the Site Defense Prototype Demonstration Program, is a BMD research and development effort looking at the next generation of BMD systems concepts which resulted from the growing Soviet threat to our offensive ballistic missiles. The direction and scope of US BMD efforts has been and will continue to be closely interrelated to US foreign and defense policy objectives and the nature of our relationship with the Soviet Union (TT 687–93). This includes US perception of Soviet military capabilities and the extent

of the threat they present to the US defense establishment (TT 700–04).[3] The clearest example of the intertwining of BMD efforts and US foreign and defense policy perspectives can be seen in the talks culminating in the 1972 SAL Agreements which limited the US and USSR to two ABM sites (TT 690). Major General Marshall, the current BMD Program Manager, who has been associated with the various BMD programs for over 6 years, described these earlier BMD efforts as a "chip at the bargaining table" during these key negotiations (TT 690). BMD has continued to play a substantial role in subsequent international arms limitation strategies (TT 691–92).

As indicated by Mr. Glen Sadler testifying on behalf of the plaintiffs concerning his membership on a committee to study the role of BMD after the SAL agreements:

The committee's job was, in light of SALT, in light of Detente, in light of the National interest in case SALT I was ever abbrogated [sic] and SALT II never came to pass or in light of the possibility that some other nation such as Communist China suddenly had the same kind of ballistic missile capability that existed at that time in Russia . . . . [W]e felt our basic objective was to try to maintain in a continuous posture of readiness to deploy within minimum times and at lowest possible cost the best possible ballistic missile defense system which could be [deployed] within whatever timeframe we had. (HT 159).

These types of policy considerations and implications are the mark of programs and efforts clearly intertwined with national defense and the elements of US foreign relations policies. Judicial interference with the implementation of these programs could hamper or limit the conduct of these policies and objectives. On July 3, 1974 the US and USSR entered into a Protocol to the

---

**2.** Hereinafter TT represents the trial transcript, and HT represents the hearing transcript from the hearing on the preliminary injunction.

**3.** As a result of this integral involvement in defense and foreign policy the BMD Program Manager, Major General Marshall, has access to high level classified information from other

Government agencies such as the Central Intelligence and Defense Intelligence Agencies. (TT 684) This further emphasizes the strategic importance of the BMD efforts.

1972 Treaty further limiting the parties to one BMD site each. In the future it is intended that BMD continue to play a central role in national defense deterrent policy (TT 691–93).

In view of the foreign and defense policy implications and importance of these efforts both the programs supported by these contracts have held the highest procurement priority rating granted by the President to major weapons systems (TT 690).[4] This is the same priority held by the Trident, Polaris, B–1 and other major weapons systems deemed by the President as integral to the national defense.

Plaintiffs have protested most strongly the Army's awarding of the SETAC contract to Teledyne-Brown Engineering, contending that this effort was more properly and effectively performed in-house by government civil servants. The decision to use the SETAC method of performance to support the then Site Defense Program and now STP was not one made in a cavalier manner by a small group of low level military officials. Consistent with BMD's established importance and the recognition of a critical need for a successor to the SAFEGUARD System (TT 903–04, 710–11, 713–14) the decision to employ a SETAC was made only after careful consideration of several alternatives (TT 715–16). These alternatives were considered by the highest echelons of the Department of Defense, including the Deputy Secretary of Defense, Director of Defense Research and Engineering, Secretary of the Army and other important defense officials. (Defendants' Exhibit 12).

■ In addition to the Executive the Congress has exercised close scrutiny over BMD activities. Congressional funding for BMD programs has fluctuated in line with defense and foreign policy decisions and internal priorities as viewed by the Congress (Defendants' Exhibits 6 and 11). These financial changes have affected both Civil Service and private contractor personnel levels. (TT 706–9, Defendants' Exhibits 7–9). The two BMD programs involved in this case, SAFEGUARD and STP, have both been directly affected by Congressional actions. The latter program represents a Congressionally directed reorientation of the previous Site Defense Program (TT 712–13). The Congress has decided to deactivate the SAFEGUARD System (TT 692–93). This is further evidence of the close involvement of these programs with national defense policy.

Based on these facts it must be concluded that the BMD programs supported by the contract efforts contested by the plaintiffs are integrally intertwined with national defense and foreign policy objectives. Further, the issuance of a permanent injunction would substantially impair the Government's ability to effectively and efficiently manage these critical programs (TT 722).

### III. PLAINTIFFS HAVE FAILED TO SHOW DEFENDANTS HAVE VIOLATED RIF REGULATIONS

■ Plaintiffs did not contest defendants' basic authority to conduct a RIF pursuant to a reorganization under the pertinent provisions of 5 CFR Part 351 (1976). Further, plaintiffs made no showing that BMDSCOM's conduct of the proposed RIF was not fully in accord with that portion of the CFR. They did allege that defendants used AR 235–5 to justify departure from the RIF regulations in that the SETAC effort could be brought in-house. However the Civil Service regulations governing RIF's nowhere require the command to examine how much work can be brought in-house before conducting a reorganization. Even if there were a requirement for such consideration, management is still not required by those provisions to bring the effort in-house. Thus plaintiffs' contentions in this regard are unfounded.

### IV. PLAINTIFFS HAVE FAILED TO DEMONSTRATE THE CAPABILITY OF THE MEMBERS OF THEIR CLASS TO PERFORM THIS WORK

■ Plaintiffs contend that their class members are capable of performing the

---

4. The STP continues to hold such a priority rating.

work currently under these three contracts and doing so in a more economic fashion. The demonstration of this capability is of critical importance to establishing that the plaintiffs' class members were in fact injured by the award of these contracts. Plaintiffs, however, have failed to demonstrate that capability. Plaintiffs presented witnesses at the preliminary injunction hearing who testified generally that they believed that the work called for under these contracts could be done in-house by civil servants. (HT 48, 61–2, 64–5, 135–38, 646–7, 674). However neither of those witnesses, Mr. Woods and Mr. Sadler, matched specific members of the class with any specific tasks being performed. They made no actual in-house versus contractor comparison to support their general conclusions. Further it must be noted that neither witness had any continuing professional responsibilities with respect to the SETAC, M & S or SAI efforts nor did they ever work in a capacity directly with any of the contractors (HT 80–82, 90–91, 119–122, 391).

At trial plaintiffs presented further testimony regarding in-house ability to perform the SAI effort. However Mr. Fargason, one of their witnesses in that regard, admitted that there was no Government expertise to perform the contract work (TT 85–86, 95–96). Through Mr. Fargason and Mr. Head, plaintiffs also tried to demonstrate that some verification and validation capability, similar to that being performed by SAI, existed at the SAFEGUARD System Evaluation Agency (SAFSEA) at White Sands, New Mexico. (TT 72–78, 109–10, 140–147). However even if this were in fact true it fails to help further the contentions of the members of plaintiffs' class. Plaintiffs made no specific showing that they were performing the same functions as the SAFSEA employees. Mr. Fargason specifically distinguished the responsibilities of BMDSCOM versus SAFSEA as being management of Bell Telephone Labs development and evaluation of the SAFE-GUARD computer software (BMDSCOM) versus independent evaluation of the functioning of the overall SAFEGUARD System (SAFSEA) (TT 72–73, 76).[5] Further he stated that his job remained the same even after the SAI contract was awarded (TT 82). Mr. Head, himself a former BMDSCOM employee now working for SAI, admitted that in his current position he was managing the performance of SAI contracts, including the one with BMDSCOM, rather than actually performing the work required (TT 115). This was confirmed by defendants' witness Mr. McClung (HT 523). Thus while some in-house capability may have existed at SAFSEA it does not follow that the same skills or expertise were available at BMDSCOM. Further, even if they were, plaintiffs have not shown that the members of their class were the individuals who possessed such capabilities. With respect to the M&S contract effort plaintiffs offered no evidence beyond the general allegations made at the preliminary injunction hearing that this work could be performed in-house. In the face of this evidence defendants' witness, Mr. McClung, formerly BMDSCOM's technical representative for both the M&S and SAI contracts since their initiation in 1972, specifically testified that there was no BMDSCOM in-house capability to do this work (HT 520–521). He contrasted the contractor and government capabilities as those of performers versus managers respectively (HT 521).

With respect to the SETAC effort none of plaintiffs' witnesses testified unqualifiedly that the entire SETAC effort could be brought in-house (HT 48, 135). Mr. Sadler stated that in the analysis and system engineering area there was no comparison between the capabilities of in-house Civil Service personnel versus those of the Teledyne-Brown people performing the SETAC (HT 135). Even with respect to that portion which arguably could be brought in-house he stated it would take 90 days to one

---

**5.** Furthermore on cross-examination Major General Marshall testified that the SETAC was not duplicating the capabilities of SAFSEA because of the differences between the SAFE-GUARD and the then Site Defense Programs (TT 736–737).

year to retrain Civil Service personnel (HT 135). For development of the entire SE-TAC capability in-house Mr. Sadler stated it would take 3 to 5 years. (HT 661).

In the face of this evidence the defendants presented equally persuasive contrary testimony by both government and contractor witnesses who had both direct contact and overall responsibility for managing these contract efforts. Mr. Charles Fendley, who drafted the initial SETAC scope of work and is annually responsible for integrating the entire scope of work into the overall procurement package, testified that neither when the contract was first initiated nor at present could the SETAC effort be brought in-house (HT 377, 379–80, 436, 478–82). Major General Marshall, in describing the evolution of BMD efforts, also stated that when faced with the commencement of the then Site Defense Program the in-house capability to perform the SETAC was not available at BMDSCOM. (TT 749–51). Finally Mr. McCarter of Teledyne-Brown, who oversees the SETAC effort and is intimately familiar with the qualifications of the Brown personnel involved in that effort, indicated that a majority of the effort could not be performed by civil servants. (TR 601–03). According to both Mr. Fendley and Mr. McCarter an in-house capability at BMDSCOM could be established only with substantial retraining. (HT 405–06, TT 612–14). The BMDSCOM personnel at present are capable of managing the SETAC effort but not of performing it. (HT 504, 505, 614–15).

Plaintiffs' failure to present any evidence that any of the plaintiffs' class can perform any of the work performed by the contractors precludes any relief for them. The heart of plaintiffs' case is that:

1) they can perform the work performed, *inter alia,* by these contractors (e. g. para. 25 complaint).

2) other civil servants (not plaintiffs) should have been hired to perform the SAI work.

3) if other civil servants had been hired, members of plaintiffs' class—since they were capable of performing the work—would have been able to compete with the civil servants who should have been hired to do the work performed by contract. The Supreme Court in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) held that a civil servant is not entitled to a position until he has been duly appointed to it. Thus, since plaintiffs' claim, as in *Testan,* is that they should have been appointed through bump and retreat procedures, *see* 5 C.F.R. part 351, they admit lack of appointment. Thus, they are entitled to no relief.

The threshold question must be "can members of plaintiffs' class perform the work now performed by contract?" If they cannot, the court need go no further, for it would be answering an academic question. Unless members of plaintiffs' class can perform the work, they have not been harmed, regardless of whether BMDSCOM has complied with the ASPR or AR 235–5. The simple fact is that plaintiffs have offered no testimony that any of their number can perform any of the functions now being performed under the contracts with M&S, SAI, or Teledyne-Brown Engineering. Although there is conflicting evidence about whether civil servants in general, rather than plaintiffs in particular, can perform the work now performed by the three companies, a finding that civil servants in general could do so in no way aids plaintiffs. The testimony throughout the hearings, as well as the documentary evidence introduced at both hearings reflects the highly technical nature of the work in question. This, coupled with the knowledge that engineers, scientists and technical people of the caliber required to perform this type work are not fungible demonstrates that such a general showing would not entitle plaintiffs to relief.

The absence of any evidence to show that members of plaintiffs' class could perform the work under any of the contracts defeats their claim to continued employment.

## V. PLAINTIFFS HAVE FAILED TO PROVE THAT ANY OF THESE CONTRACTS CONSTITUTE PERSONAL SERVICES

██ Plaintiffs' claim, *inter alia,* that contracts between BMDSCOM and M&S, SAI, and Teledyne-Brown constitute contracts for personal services in violation of the ASPR section XXII, 32 C.F.R. 22.000 *et seq.* Complaint, paragraphs 6, 10B. (iii) (M&S), 19 (Teledyne-Brown Engineering), 22, (SAI) and 25.

ASPR 22–102.1(a) defines personal services contracting as the procurement by contract of services "in such a manner that the contractor or his employees are in effect employees of the Government." (32 C.F.R. 22.102–1(a)). ASPR XXII imposes the duty of insuring adherence to it upon the Contracting Officer, *id.,* and grants to the Contracting Officer wide latitude in exercising his judgment in assessing whether the contract is one for personal services. 22–102.2 (32 C.F.R. 22.102–2).[6]

The ASPR then goes on to identify the following 16 factors to be reviewed by the Contracting Officer in judging whether the contract is one for personal services:

A. The nature of the work.

1. To what extent the Government can obtain civil servants to do the work. (only useful in doubtful cases) (22–102.2(a)(1))

2. To what extent the services contracted for represent the discharge of a Governmental function which calls for the contractor to exercise personal judgment on the Government's behalf.

(If present to sufficient degree, may render the services personal). 22–102.2(i)(B) (32 C.F.R. 22.102–2(a)(2)).

3. To what extent the requirement is continuing (Only useful in doubtful cases) 22–102.2(i)(C) (32 C.F.R. 22.102–2(a)(3)).

B. Contractual Provisions concerning Contractor Employees (Government control and supervision of contractor employees if present to sufficient degree may render the services personal).

4. To what extent the Government specifies the qualifications of, or reserves the right to approve the hire of contractor employees. (permissible for Government to specify technical and experience qualifications to some extent in the contract). 22–102.2(ii)(A) (32 C.F.R. 22.102–2(b)(1)).

5. To what extent the Government reserves the right to assign specific tasks to and prepare work schedules for contractor employees during contract performance. 22.102–2(ii)(B) (32 C.F.R. 22.102–2(b)(2)).

6. To what extent the Government retains the right to supervise the work of individual contractor employees. 22–102.2(ii)(C) (32 C.F.R. 22.102–2(b)(3)).

7. To what extent the Government reserves the right to supervise or control the method in which the contractor performs the service, the number of people he will employ, the duties of individual employees or similar day-to-day details of the contractor's operation. 22–102.2(ii)(D) (32 C.F.R. 22.102–2(b)(4)).

---

**6.** Section 22–102.2 (5 C.F.R. 22.102–2) provides:

22–102.2 Criteria for Recognizing Personal Services. There are no definitive rules for characterizing particular services as "personal" or "nonpersonal." There are many factors involved, all of which are not of equal importance. The characterization of services in a particular case cannot be made by simply counting factors, but can only be the result of a balancing of all the factors in accordance with their relative importance. The following fac-

tors shall be considered, as well as any others which are relevant (some of the following factors include parenthetical explanations or qualifications which indicate the type of judgment that the contracting officer should exercise).

Although to some degree portions of these findings relate to what are more appropriately conclusions of law, they are included here for purposes of clarity and continuity. They will be further addressed in the conclusions of law portion of this opinion.

8. To what extent the Government reviews the performance of each individual contractor employee as opposed to review of a final product. 22–102.2(ii)(E) (32 C.F.R. 22.102–2(b)(5)).

9. To what extent the Government retains the right to remove contractor employees from the job for other than security or misconduct reasons. 22–102.2(ii)(F) (32 C.F.R. 22.102–2(b)(6)).

C. Other Contractual Provisions

10. Whether services can properly be defined as an end product. 22–102.2(iii)(A) (32 C.F.R. 22.102–2(c)(1)).

11. Whether the contractor undertakes a specific task definable either at the inception or at some point during the contract, or whether the Government defines the work on a day-to-day basis. 22–102.2(iii)(B) (32 C.F.R. 22.102–2(c)(2)).

12. Whether payment is for results accomplished or for time worked, (useful only in doubtful cases). 22–102.2(iii)(C) (32 C.F.R. 22.102–2(c)(3)).

13. To what extent the Government furnishes office space, facilities, equipment, and supplies necessary for contract performance (useful only in doubtful cases) 22–102.2(iii)(D) (32 C.F.R. 22.102–2(c)(4)).

D. Contract Administration

14. To what extent contractor and Government employees are used interchangeably to perform the same function. 22–102.2(iv)(A) (32 C.F.R. 22.102(d)(1)).

15. To what extent the contractor employees are integrated into the Government's organizational structure. 22–102.2(iv)(B) (32 C.F.R. 22–102.2(d)(2)).

16. To what extent factors B and C are present in the contract's administration regardless of whether the contract's terms provide for them. 22–102.2(iv)(C) (32 C.F.R. 22.102–2(d)(3)).

As can be seen from these factors, the ASPR requires the Contracting Officer to make judgments based on the contract, its administration and his experience. In short ASPR XXII confers upon the Contracting Officer broad discretion in reaching his judgment on whether the contract is one for personal or nonpersonal services. The presence of this broad discretion will be treated more fully in the conclusions of law, *infra*, p. 1079.

A. *The M & S Contract*

The most significant testimony regarding the M & S contract was the unrebutted testimony that when the contract expired on June 30, 1976, it would not be renewed. (HT 519, 520; TT 175). Accordingly, plaintiffs' allegations regarding that contract became moot on that date.

Most damaging to plaintiffs' case is their failure to adduce any evidence that any among their number are capable of performing the analytical tasks required to be performed under the M & S contract. Mr. D. R. McClung testified at the hearings on the preliminary injunction that the personnel at BMDSCOM failed to possess the technical capability to perform the analysis required by the M & S contract (HT 521). Plaintiffs offered no testimony to show that any of their number could perform the analytical tasks required of M & S personnel under the contract. Consequently, without such a showing they are entitled to no relief.

Furthermore, the record affirmatively reflects that the contract between BMDSCOM and M & S Computing, Inc. can in no way be construed to be a contract for personal services.

The sixteen criteria on which the contracting officer is to make his judgment regarding personal services are listed in ASPR 22–102.2(i), (ii), (iii) and (iv). The record shows as follows:

22–102.2

(i)(A) Can the Government obtain civil servants to do the work?

The contracting officer said no. (Plaintiffs' Exhibits 5 and 6).

Wilbur Davis said yes (TT 239).

Although the evidence is conflicting, it need not be resolved.

ASPR 22–102.2(i)(A) states this provision has little weight.

(B) Do the services represent a discharge of a Governmental function? D. R. McClung said no (HT 518).

The contracting officer said no (para. l. c. d. Plaintiffs' Exhibits 5, 6).

The unrebutted evidence demonstrates that M & S does not perform a Governmental function.[7]

(C) Is the requirement a continuing one?

D. R. McClung testified no. (HT 519, 520)

Frank Brown stated it was not a continuing requirement (TT 175).

The contracting officer stated it was not a continuing requirement. (paragraph l. e., Plaintiffs' Exhibits 5, 6).

The unrebutted evidence demonstrates that the requirement is not a continuing one.

22–102.2

(ii)(A) Does the Government specify the qualifications of individual M & S employees?

Frank Brown testified the Government does not specify the qualification of the individual M & S employees. (TT 175).

The contracting officer stated the Government did not specify qualifications of M & S employees. (Para. II a., b., Plaintiffs' Exhibits 5 and 6).

The unrebutted evidence demonstrates that the Government does not specify the qualifications of individual M & S employees.

(B) Does the Government assign tasks or prepare work schedules for individual M & S employees?

Frank Brown stated the Government did not assign tasks or work schedules for M & S employees (TT 175).

The contracting officer reported the Government did not assign tasks or prepare work schedules for individual M & S employees (para II c., Plaintiffs' Exhibits 5, 6).

Frank Brown noted that there was communication between BMDSCOM and M & S (TT 164). He also stated that when discussing specific tasks with M & S personnel the purpose of the contact was to establish priorities or clarifications among the tasks required by the scope of work of the contract (TT 160, 162–163, 165, 167, 175). Although Mr. Brown indicated that he *recommended* to M & S which employees should be used to perform tasks required by the contract's scope of work, he emphasized that it was done solely within the context of priorities. (TT 167–168).

This provision of the ASPR addresses task assignments of individual contractor employees, or work schedules of individual contractor employees. On that precise question Frank Brown testified:

Q. And you don't prepare work schedules for individual contractor employees?

A. Not for the individual, for the task, yes.

Q. But you merely assign, as far as dealing with the M & S supervisory

---

**7.** Although Charles Woods offered testimony which indicated that the M & S Contract contracted for functions which were "managerial in nature" (*See* para 2–3 a.(1), AR 235–5) (HT 57), he offered no testimony to indicate that the contract required M & S to exercise "personal judgment and discretion on behalf of the Government." ASPR 22–102.2(i)(B). In any event D. R. McClung testified emphatically that the Government makes the decisions and exercises the personal judgment based on technical data provided by the contractor (HT 518). Mr. McClung who has had the responsibility for the M & S contract (TT 517) is in the better position to know those facts.

[personnel], you are talking with them in order to clarify priorities among tasks?

A. That's correct, yes, sir. (TT 175).

\* \* \* \* \* \*

Q. It's up to M & S to determine how to perform their tasks?

A. Yes. (TT 176)

Consequently, the evidence affirmatively shows that the Government neither prepares work schedules for, nor assigns tasks to, individual M & S employees.

(C) Does the Government supervise the work of individual M & S employees?

The only evidence on this point was the contracting officer's statement that the Government did not. (Para II. d., Plaintiffs' Exhibits 5, 6).

The unrebutted evidence shows that the Government does not supervise the work of M & S employees.

(D) Does the Government supervise or control the method by which M & S performs its service?

Frank Brown testified the Government did not (TT 176).

The contracting officer stated the Government did not. (paras, II a.–d., Plaintiffs' Exhibits 5, 6).

The contract between Frank Brown and M & S in the context of priorities is no evidence that BMDSCOM supervises or controls the method by which M & S performs its service. In any event, Mr. Brown specifically testified that it was up to M & S to determine the method by which it performs its service (TT 176).

Thus, the evidence reflects that M & S, not BMDSCOM, controls the method by which M & S will perform.

(E) Does the Government review the performance of individual M & S employees?

Frank Brown reported that BMDSCOM did not. (TT 175).

The contracting officer reported the Government did not. (para II. e., Plain-

tiffs' Exhibits 5, 6). The unrebutted evidence reflects that the Government does not review the performance of individual M & S employees.

(F) Does the Government have the right to remove individual M & S employees?

The only evidence on this criterion is the contracting officer's conclusion that the Government does not have that right. (para II. f., Plaintiffs' Exhibits 5, 6).

The unrebutted evidence demonstrates the Government has no right to remove individual M & S employees.

(iii)(A) Are services an end product?

The contracting officer concluded services were not the end product (para I. f., Plaintiffs' Exhibits 5, 6).

Mr. Davis agreed that services were not the end product. (TT 244).

The unrebutted evidence demonstrates services are not an end product.

(B) Does the Government define the work M & S performs on a day-to-day basis?

The only evidence offered on this criterion was the contracting officer's statement that the Government did not. (para 1. g., Plaintiffs' Exhibits 5, 6).

Although Frank Brown testified that he spoke with M & S, he emphasized that the discussions were only in terms of priorities among tasks defined by the scope of work. (TT 167–168, 175).

The evidence demonstrates that the Government does not define the work M & S performs on a day-to-day basis.

(C) Will payment be solely for time worked?

The only evidence on this point is the contracting officer's conclusion that payment would not be solely for time worked. (para I. h, Plaintiffs' Exhibits 5, 6).

The unrebutted evidence reflects that payment is not made solely for time worked.

(D) Does the Government furnish office space or supplies to M & S?

The only evidence on this criterion is the contracting officer's statement that the Government did not. (para I. i., Plaintiffs' Exhibits 5, 6).

The unrebutted evidence reflects that the Government does not furnish M & S office space or supplies.

(iv)(A) Will M & S and Government employees be used interchangeably?

Frank Brown testified they were not. (TT 174–175).

The contracting officer reported they were not. (para III. a., Plaintiffs' Exhibits 5, 6).

The unrebutted evidence demonstrates that M & S and Government employees were not used interchangeably.

(B) Will M & S employees be integrated into the BMDSCOM organizational structure?

Frank Brown testified they were not. (TT 175).

The contracting officer stated they were not. (para III. b., Plaintiffs' Exhibits 5, 6).

(C) Are any elements in (ii) and (iii) present in the administration of the contract?

The testimony of Frank Brown, discussed above, dealt with the administration of the contract.

The contracting officer concluded that there would be no change during the administration of the contract (para III. c., Plaintiffs' Exhibits 5, 6).

As noted above, the only testimony of Frank Brown specifically addressing the ASPR criteria indicates that M & S is not a personal services contract.

Even viewed in the light most favorable to plaintiffs, they presented evidence which would raise questions on only five of the sixteen ASPR criteria. In each of those five instances the evidence for BMDSCOM was more compelling. The critical point is that even in the disputed areas, the ASPR requires the exercise of judgment in the evaluation. As plaintiffs' Mr. Davis testified, analysis of the ASPR criteria requires the exercise of judgment, and judgment in the area of ASPR XXII is something on which reasonable men could differ. (TT 324–325).

Accordingly, the judgment exercised by BMDSCOM in evaluating the M & S contract for personal services is well within the latitude of reasonableness. The facts demonstrate that the contract between BMDSCOM and M & S is not inconsistent with the requirements of ASPR XXII. It is not a personal services contract.

## B. *The SAI Contract*

As with the other contracts, the fatal flaw in plaintiffs' case is their failure to present any evidence that the members of their class could perform any of the tasks required to be performed under the SAI contract. Mr. McClung testified at the hearings on the preliminary injunction that BMDSCOM personnel had no technical capability to perform the work done by SAI. (HT 521).

Plaintiffs' witness John Fargason agreed. He explained:

Q. Would it be fair to say they [SAI] were giving you the technical expertise you did not have available to you in-house at that time?

A. That's correct. The software, as I said directed the radar, it directed the missile systems. We didn't have anybody in our group that was familiar enough with the ballistic missile peculiarities or the radar[']s limitations to properly evaluate the software in this area. (TT 95).

He also testified that SAI was used because they had that necessary expertise. (TT 97).

Another of plaintiffs' witnesses, Donald Head, testified that he went to work for SAI after being notified that he would be affected by the RIF challenged by this litigation. (TT 100). Yet, he was careful to note that rather than performing the technical, analytical work required of SAI under its BMDSCOM contract, or other con-

tracts, he managed contractual effort for SAI. (TT 115, 116).

Therefore, the testimony of record shows BMDSCOM had no people with the technical expertise necessary to perform the functions SAI performed under its contract. Plaintiffs' failure to prove that any of their number could perform the work leaves this court without authority to grant them any relief.

Furthermore, the record affirmatively reflects that the contract between BMDSCOM and SAI can in no way be considered to be a contract for personal services.

Analyzing the sixteen ASPR criteria on which the contracting officer must make his judgment regarding personal services, ASPR 22–102.2(i), (ii), (iii) and (iv), the record shows as follows:

(i)(A) Can the government obtain civil servants to do the work?

D. R. McClung testified that BMDSCOM has no personnel qualified to do the work. (HT 521).

Wilbur Davis believed that civil servants with the ability to perform the work could be found. (TT 239).

With regard to four modifications to the SAI contract, the contracting officer for the procurement concluded civil servants could perform the work specified by those modifications. (para I. a., Plaintiffs' Exhibits 8–11).

With regard to the basic SAI contract and its two modifications, the contracting officer for the particular procurement concluded civil servants were unavailable to perform the work. (para I. a., Plaintiffs' Exhibits 7, 12 and 13).

Although the record is conflicting regarding the different procurements, the court need not resolve the conflict. First, the determination is within the realm of judgment and discretion granted to the contracting officer. Second, ASPR 22–102.-2(i)(A) indicates that this factor is only useful in "doubtful case[s]," and this is not such a case.

(B) Do the services represent a discharge of a Governmental function requiring SAI to exercise personal judgment on behalf of the Government?

D. R. McClung testified no. (HT 517–518).

John Fargason stated that SAI provided technical data and the judgment and discretion was exercised by BMDSCOM based in part on that data (TT 88, 90).

Donald Head's testimony was to the same effect (TT 128, 130, 134, 136).

The contracting officer for the various procurements concluded, in each case, that no Governmental function, requiring SAI to exercise personal judgment on behalf of the Government, was involved. (para I. c., d., Plaintiffs' Exhibits 7–13).

The unrebutted evidence demonstrates that the SAI contract does not require SAI to discharge a governmental function or require SAI to exercise personal judgment on behalf of the Government.[8]

(C) Is the requirement a continuing one?

D. R. McClung reported that the SAI effort was significantly diminishing (HT 519, 520).

Donald Head also testified that the effort performed by SAI was diminishing (TT 116).

Wilbur Davis felt the requirement was continuing (TT 234).

For each of the SAI procurements, the contracting officer concluded the requirement was not a continuing one (para I. e., Plaintiffs' Exxhibits 7–13).

---

**8.** Charles Woods was of the opinion, based solely on the SAI scope of work, that the contract gave managerial functions to SAI (HT 59). He offered no testimony to indicate that the contract required SAI to exercise "personal judgment and discretion on behalf of the government." ASPR 22–102.2(i)(B). In any event D. R. McClung's testimony coupled with that of Donald Head and John Fargason, all of whom were in a position to know the facts, demonstrates that the SAI contract in no way obligates the contractor to perform Government functions.

Despite the conflicting conclusions, this conflict need not be resolved. This criterion is insignificant. ASPR 22–102.-2(i)(C).

(ii)(A) Does the Government specify the qualifications of individual SAI employees?

No witness specifically addressed this question. Mr. Fargason testified that BMDSCOM did not tell SAI who should work on tasks (TT 97) and that SAI was free to do its job any way it wanted to (TT 98).

The contracting officer for each of the SAI procurements concluded the Government did not specify the qualifications of individual SAI employees (para II. a., b., Plaintiffs' Exhibits 7–13).

The unrebutted evidence demonstrates that the Government does not specify the qualifications of individual SAI employees.

(B) Does the Government assign tasks or prepare work schedules for individual SAI employees?

Mr. Fargason testified that BMDSCOM did not tell SAI how to perform its work or who should work on a task (TT 97). He reported that SAI was free to do its job any way it wanted to, and it was up to SAI how to perform the work required by the contract's scope of work (TT 98).

Mr. Head stated that BMDSCOM did not supervise SAI employees (TT 136). He also indicated that BMDSCOM did not tell SAI how to perform its tasks (TT 138).

The various contracting officers for the procurements in question concluded that the Government did not assign tasks or prepare work schedules for individual SAI employees. (para II. e., Plaintiffs' Exhibits 7–13).

Mr. Head indicated that he informed SAI that they should have people at a particular test (TT 129, 131), but he explained that often the only way to observe a test was to view video scopes during a test since the printouts of those tests were valueless. (TT 133).

In any event, he gave no indication that he, or anyone, assigned tasks to or prepared work schedules for SAI employees by name. The evil addressed by this ASPR criterion is the Government's assignment of tasks or work schedules to individual contractor employees. There is no evidence that this was done.

The evidence affirmatively shows that the Government neither prepares work schedules for nor assigns tasks to individual SAI employees.

(C) Does the Government supervise the work of individual SAI employees?

Mr. Head stated BMDSCOM did not (TT 136).

The contracting officers concluded that, in each of the SAI procurements, the government did not supervise the work of individual SAI employees. (para II.d., Plaintiffs' Exhibits 7–13).

The unrebutted evidence shows that the Government does not supervise the work of individual SAI employees.

(D) Does the Government supervise or control the method by which SAI performs its service?

Mr. Fargason stated that BMDSCOM did not tell SAI how to perform its tasks (TT 97). He also reported that SAI was free to do its job anyway it wanted to. (TT 98).

Mr. Head stated that SAI was told which tests to analyze, not what types of tests to run during that analysis. (TT 120, 138–139).

The contracting officers who evaluated the procurements in question all concluded that the Government did not dictate or control the method by which SAI performed its service (para II.a.–d, Plaintiffs' Exhibits 7–13).

The oral contact between SAI and Head and Fargason is of little weight in view of their specific testimony that it was up to SAI how it performed its work under the contract.

The evidence of record shows that SAI, not BMDSCOM, controls the manner in which SAI performs its service.

(E) Does the Government review the performance of individual SAI employees?

Mr. Head testified that BMDSCOM did not rate the performance of individual SAI employees. (TT 136).

Mr. Fargason's testimony is to the same effect. He stated he knew who some of the SAI personnel were only because they occasionally signed the reports sent to BMDSCOM. (TT 91). Obviously, he could not have been rating the performance of individual SAI employees.

The conclusions of the contracting officers for the various procurements agreed that the Government did not review the performance of individual SAI employees. (para II.e., Plaintiffs' Exhibits 7–13).

The unrebutted evidence demonstrates that the Government did not review the performance of individual SAI employees.

(F) Does the Government have the right to remove individual SAI employees for other than security or misconduct reasons?

The only evidence on this criterion is the various contracting officers' conclusions that the Government does not have that right. (para II.f., Plaintiffs' Exhibits 7–13).

Mr. Fargason reported that after he reported to his superiors that an SAI employee, Vic Salem, provided information which Fargason believed inadequate, Salem faded out of the picture (TT 93). He was careful to note, however, that he, Fargason, had no knowledge of what happened to Salem (TT 93). Plaintiffs offered no other evidence on this point. This testimony provides no evidence that Salem was removed from the job, or that anyone in BMDSCOM caused it. Furthermore, even if it could be so construed, one instance in over five years is insufficient evidence to conclude that BMDSCOM has the right to remove SAI employees.

The evidence reflects that the Government has no right to remove SAI employees for other than security or misconduct reasons.

(iii)(A) Are services an end product?

All the contracting officers for the various procurements but one agreed that services were not the end product (para I.f., Plaintiffs' Exhibits 7, 9–13). (In Plaintiffs' Exhibit 8, the contracting officer concluded services were an end product).

Even Mr. Davis agreed that services were not the end product. (TT 244).

The evidence demonstrates services are not the end product.

It should be noted that this criteria cannot be of significant importance. The ASPR gives as example of a nonpersonal services contract in which services are the end product, a contract for janitorial services. ASPR 22–102.(b)(iii). A further example of a nonpersonal services contract given by the ASPR is one for the delivery of lectures; there the lectures, not the service, would be the end product. Thus, whether services or reports constitute the end product makes little difference. Mr. Davis conceded this at the hearing on the preliminary injunction (HT 741). The evil to be avoided is an employer-employee relationship between the Government and SAI employees. Without analysis of other factors, whether services are an end product is of little aid.

(B) Does the Government define the work performed by SAI on a day-to-day basis?

Mr. Head testified that the work was spelled out in the scope of work of the SAI contract: evaluate tasks, analyze codes and perform special studies. (TT 135).

The contracting officers for the procurements agreed that the Government does not define the work to be performed by SAI on a day-to-day basis. (para I.g., Plaintiffs' Exhibits 7–13).

Mr. Head indicated that the specific tests to be analyzed by SAI were not identified in the contract's scope of work, that was done during the course of the contract (TT 119); he pointed out, however, that when the tests to be analyzed were identified, SAI was not directed to analyze them in a particular way. (TT 120).

The significant point here is that the work to be performed was identified in the scope of work of the SAI contract. SAI was bound to perform by that contract. Thus, the work required was defined by the contract and not defined on a day-to-day basis by BMDSCOM.

(C) Is payment to SAI made solely for the time worked?

The only evidence on this criterion is the unanimous agreement of the contracting officers that payment was not made solely for the time worked. (para I.h., Plaintiffs' Exhibits 7–13).

(D) Does the Government furnish office space or supplies to SAI?

The unanimous agreement of the contracting officers for the various procurements that the Government provides neither office space nor supplies to SAI stands unrebutted. (para I.i., Plaintiffs' Exhibits 7–13).

(iv)(A) Will SAI employees be used interchangeably with Government employees?

The contracting officers all agreed they would not. (para III.a., Plaintiffs' Exhibits 7–13).

The unrebutted evidence demonstrates that Government and SAI employees would not be used interchangeably.

(B) Will SAI employees be integrated into the BMDSCOM organizational structure?

The only evidence, the unanimous conclusion of the contracting officers for the various procurements, demonstrates that SAI employees are not integrated into the BMDSCOM organizational structure. (para III.b., Plaintiffs' Exhibits 7–13).

(C) Will any of the criteria in (ii) and (iii) be present during the administration of the contract?

The testimony of Donald Head, John Fargason or D. R. McClung specifically addressing the sixteen criteria to be assessed by the contracting officer indicates that none of those criteria are present.

The contracting officers all agreed that there would be no change during the performance of the contract. (para III.c., Plaintiffs' Exhibits 7–13).

At best there is conflicting evidence regarding only six of the sixteen ASPR criteria. Plaintiffs' NASA expert, Mr. Davis, based his conclusion that the contract was for personal services on only two of the ASPR criteria. Contrary to the contracting officers who reviewed the SAI procurements, Mr. Davis believed that the requirement for the SAI contract was a continuing one (TT 234) (ASPR 22–102.2(i)(C)). Mr. Davis also believed that civil servants could perform the effort performed under the SAI contract. (TT 239, 242) (ASPR 22–102.-2(i)(A)). The only ASPR criteria specifically addressed by Mr. Davis are, by the ASPR itself, very minor considerations: "This is a factor which *might* be useful in a doubtful case . . ." (emphasis added) (ASPR 22–102.2(i)(A) and (C)). More importantly, Mr. Davis emphasized that the judgment of whether a contract was one for personal services required attention to the administration of the contract, as well as the contract files (TT 214, 217; HT 724). On cross examination, counsel embarked on a course of questions dealing with the specific ASPR criteria. Mr. Davis was asked whether M&S employees were integrated into the BMDSCOM organizational structure (ASPR 22–102.2(iv)(B)): Mr. Davis had no knowledge of whether they were (TT 287). When the same question was asked regarding SAI, Mr. Davis explained that he had not reviewed the administration of any of the contracts. (TT 287–288).

Hence, not only did Mr. Davis contradict the contracting officers' judgments on only two insignificant entries of the sixteen ASPR criteria, he conceded he made his judgment without reviewing the actual performance under the contracts. Interestingly, Mr. Davis, in agreement with the all but one contracting officer's conclusions (para I.f., Plaintiffs' Exhibit 8) believed that since, *inter alia,* services were not an end product, the contract was one for personal services (TT 244). Yet, it is when services are the end product, that the contracting officer should perhaps be more cautious. Indeed, ASPR 22–101(a) indicates that "[a] service contract is one which calls directly for a contractor's time and effort . . . ." In that case service would be an end product. Thus, the fact that services are not an end product weighs in favor of non-personal, rather than personal, services. Mr. Davis apparently conceded as much earlier (HT 741). Mr. Davis' conclusion that services are not an end product supports the contracting officers' determinations of non-personal services rather than his own conclusion of personal services.

Mr. Davis also gave his opinion that the memoranda in the form of checklists in the contract files, Plaintiffs' Exhibits 7–13, did not satisfy the memorandum requirement of ASPR. Yet, as he conceded, the ASPR does not define memorandum (TT 307). He admitted that, until this case, he had never made an ASPR XXII determination (TT 205), and he admitted that ASPR XXII was inserted into the regulations after he left Army procurement (HT 713). Mr. Davis admitted he had never even made a determination as a contracting officer under the NASA equivalent of ASPR XXII (TT 206). Mr. Davis ceased to execute contracts for NASA in 1960 or 1961. (*Id.*) The NASA equivalent to ASPR XXII did not become a part of the NASA procurement regulations until 1964 (TT 1164). Consequently, Mr. Davis has never drafted or reviewed such a memorandum under ASPR.

The only evidence bearing on whether the memoranda Davis questioned were adequate, was the complimentary review of BMDSCOM procurement practices conducted under the auspices of the Assistant Secretary of the Army for Installations and Logistics: (Defendants' Exhibit 14) (*see* AR 715–11, Defendants' Exhibit 13). The review team noted that the contract files "were completely adequate to support the actions taken . . . ." (para II., p. 7, Defendants' Exhibit 14).

The key to resolving whether the SAI contract is one for personal, or non-personal services, as with the other contracts, is in the judgmental discretion conferred upon the contracting officer. As Mr. Davis acknowledged, the determination is a judgment based on all sixteen factors; the factors are of varying importance; and, the judgment is not a question of black and white, but a question of degree (TT 217). Indeed, as this court noted, the criteria are quite subjective (HT 727). Obviously judgments on these criteria are ones on which reasonable men can differ based on a given set of facts (TT 324–325). The record in the case of SAI supports defendants' contention that the contract between BMDSCOM and SAI is a nonpersonal services contract. Certainly, the conclusion of the contracting officers is well within the reasonable judgment range. Plaintiffs have failed to show those judgments were arbitrary or capricious, or that they constituted an abuse of discretion.

(C) *The Teledyne-Brown, SETAC, Contract*

As with the other two contracts, plaintiffs failed to introduce any evidence that any members of their class can perform any of the tasks required to be performed by the contractor under the Teledyne-Brown, SETAC, contract. Plaintiffs' witness Glen Sadler testified that the systems analysis–systems engineering portion of the SETAC contract could never have been done in-house; BMDSCOM just does not possess talent comparable to Teledyne-Brown. (HT 135, 136). Charles K. Fendley, from the

Site Defense Project Office (now the Systems Technology Project Office) testified that systems analysis–systems engineering was 90 to 100% of the Teledyne-Brown contract (HR 379–380). Mr. McCarter for *amicus* Teledyne-Brown stated the contract was almost entirely systems analysis–systems engineering (TT 510). Although he indicated the effort was not completely systems analysis (TT 653), Mr. McCarter described the SETAC as a systems analysis unit. (TT 651).

The point is that plaintiffs' witness conceded that the systems analysis could not be performed in-house, and the people most knowledgeable about the Teledyne-Brown, SETAC, contract, Mr. Fendley and Mr. McCarter, described the contract as nearly totally systems analysis. Thus, the testimony shows the effort cannot be performed in-house.

Furthermore, plaintiffs offered no testimony which addressed the ability of any of their number to perform the work performed by Teledyne-Brown Engineering. Accordingly, even if the effort could be performed in-house, there has been no evidence to show that plaintiffs in this action could do it. Unless plaintiffs have the talent to perform the work, they have not been harmed by BMDSCOM's failure to have performed the SETAC effort in-house. Since plaintiffs have not adduced any evidence in support of their claim that they can perform, they are entitled to no relief.

In any event, the record affirmatively demonstrates that the Teledyne-Brown, SETAC, contract is not one for personal services.

The record reveals the following regarding the sixteen criteria in ASPR 22–102.2 on which the contracting officer must make his judgment.

22–102.2

(i)(A) Can the Government obtain civil servants to do the work?

Mr. Fendley testified civil servants could not. (HT 379–380, 436, 456).

Mr. McCarter testified that at best civil servants could perform only 15% of the work (TT 602).

Even plaintiffs' witness agreed that at least 30% of the effort could not be performed in-house (HT 650).

The evidence demonstrates that the SETAC effort could not be performed by civil servants. It should be noted that plaintiffs have offered no testimony or any other evidence giving any indication that an effort must be dismembered to achieve adherence to either the ASPR or AR 235–5.

(B) Do the services represent the discharge of a governmental function requiring Teledyne-Brown to exercise personal judgment and discretion on behalf of the Government?

Mr. Fendley testified that the Government makes the judgment based, *inter alia,* on technical data provided by Teledyne-Brown (HT 384, 392, 395).

Mr. McCarter, a Vice President of Teledyne-Brown, testified that the contractor did not exercise personal judgment on behalf of the Government (TT 534).

The unrebutted evidence demonstrates that Teledyne-Brown exercises no personal judgment on behalf of the Government.

(C) Is the requirement a continuing one?

Mr. Fendley testified that the effort was conceived as a five year requirement, which was extended to eighty months (HT 378). He also noted that the nature of the Site Defense Program has been changed from a prototype demonstration program to a technology validation program (HT 926). General Marshall described the evolution in detail (TT 710–713). It is now called the Systems Technology Program. Although the need for a SETAC would have diminished under the prototype demonstration program, whether there will be a continuing need for the SETAC now is unclear from the record.

Whether the requirement can be denominated a continuing one need not be resolved. As noted above, this factor is useful only in doubtful cases, and this is not such a case.

(ii)(A) Does the Government specify the qualifications of individual Teledyne-Brown employees?

The unrebutted testimony of Mr. McCarter demonstrates that the Government does not specify the qualifications of Teledyne-Brown employees. (TT 535–536).

(B) Does the Government assign tasks to or prepare work schedules for Teledyne-Brown employees?

Mr. Fendley, who knew the proscription against personal services from his NASA days (HT 374–375, 396), testified emphatically that the Government did not (HT 396, 435).

Mr. McCarter was equally clear; the Government does not assign tasks to or prepare work schedules for Teledyne-Brown employees (TT 535).

The unrebutted testimony demonstrates that the Government neither assigns tasks to nor prepares work schedules for Teledyne-Brown employees.

(C) Does the Government supervise the work of individual Teledyne-Brown employees?

Mr. Fendley testified that Teledyne-Brown supervises its employees (HT 435).

Mr. McCarter stated that Teledyne-Brown, not BMDSCOM, supervised the Teledyne-Brown employees (TT 535).

The unrebutted testimony demonstrates that the Government does not supervise the work of individual Teledyne-Brown employees.

(D) Does the Government supervise or control the method by which Teledyne-Brown performs its service?

Mr. Fendley testified that the Government neither supervises nor controls the method by which Teledyne-Brown performs its contract (HT 396, 435).

Mr. McCarter testified that Teledyne-Brown, not the Government, determines Teledyne's method of performance (TT 535).

The unrebutted testimony demonstrates that the Government neither supervises nor controls the method of performance of Teledyne-Brown.

(E) Does the Government review the performance of individual Teledyne-Brown employees?

Mr. Fendley reported that BMDSCOM did not review individual Teledyne-Brown employee performance (HT 435).

Mr. McCarter testified that only Teledyne-Brown reviewed the performance of its employees (TT 535).

The unrebutted evidence demonstrates that the Government does not review the performance of individual Teledyne-Brown employees.

(F) Does the Government have the right to remove individual Teledyne-Brown employees for other than security or misconduct reasons?

Mr. Fendley testified that he had neither control nor exercised any managerial responsibility regarding Teledyne-Brown personnel (HT 396, 435).

Mr. McCarter testified only Teledyne-Brown could remove its employees (TT 535).

(iii)(A) Are services an end product?

Mr. Fendley testified that the end products were the deliverable reports and analyses required by the contract (HT 395).

Mr. McCarter testified the end product was the study, analysis or report (TT 510–11, 532).

Mr. Davis testified that there were no end products required by the contract (HT 735); however, he later admitted that a study or report can be an end product (TT 300). Mr. Davis' testimony

is consistent with Mr. McCarter's and Mr. Fendley's.

The evidence demonstrates that services are not an end product.

(B) Does the Government define the work to be performed by Teledyne-Brown on a day-to-day basis?

Mr. Fendley reported the Government did not (HT 396, 435)

Mr. McCarter testified that the Government did not (TT 531–32).

The unrebutted testimony demonstrates that the Government does not define the work to be performed by Teledyne-Brown on a day-to-day basis.

(C) Is payment to be made to Teledyne-Brown solely for time worked?

No. evidence was introduced on this point.

(D) Does the Government furnish office space or supplies to Teledyne-Brown?

Mr. McCarter testified emphatically that the Government did not (TT 536).

Mr. Davis testified that some Teledyne-Brown personnel worked at the SAFE-GUARD site in North Dakota (TT 287). Mr. McCarter specifically contradicted that testimony (TT 536).

The evidence demonstrates that the Government furnishes neither office space nor supplies to Teledyne-Brown.

(iv)(A) Will Teledyne-Brown employees be used interchangeably with Government employees?

Mr. Fendley testified that BMDSCOM employees absolutely could not perform the work being performed by Teledyne-Brown (HT 377, 379–380).

Mr. McCarter testified that at most only 15% of the work performed by Teledyne-Brown could be performed by BMDSCOM employees (TT 602).

A fortiori, if BMDSCOM personnel cannot perform the effort, Teledyne-Brown employees cannot be used interchangeably with Government employees. The evidence therefore demonstrates that BMDSCOM and Teledyne-Brown employees are not used interchangeably.

(B) Are Teledyne-Brown employees integrated into the BMDSCOM organizational structure?

Mr. Fendley indicated they were not (HT 374, 396, 435).

Mr. McCarter indicated they were not (TT 535–536).

The unrebutted evidence demonstrates that Teledyne-Brown employees are not integrated into the BMDSCOM organizational structure.

(C) Will any of the criteria in (ii) or (iii) be present during the administration of the contract?

The above testimony of Mr. McCarter and Mr. Fendley demonstrates that none of the elements of ASPR 22–102.2(ii) and (iii) are present during the administration of the contract.

In the light most favorable to plaintiffs, they offered contradictory testimony on only two of the sixteen elements: Mr. Sadler's testimony that civil servants could do some of the work, and Mr. Davis' testimony that there was no end product.

Mr. Davis' conclusion that the Teledyne-Brown contract was one for personal services displays a shocking disregard for the criteria on which that judgment must be based.

He did not know whether civil servants could perform the tasks (HT 752; ASPR 22–102.2(i)(A)). He did not know whether Teledyne-Brown exercised personal judgment and discretion on behalf of BMDSCOM (HT 752–753; ASPR 22–102.-2(i)(B)). He did not know whether the requirement was a continuing one (HT 753; ASPR 22–102.2(i)(C)). He did not know whether BMDSCOM specified the qualifications of individual Teledyne-Brown employees (HT 753; ASPR 22–102.2(ii)(A)). He did not know whether BMDSCOM supervised the work of individual Teledyne-Brown employees (HT 754; ASPR 22–102.-2(ii)(C)): and he admitted that the contract

did not so provide. (HT 754). He did not know whether BMDSCOM reviewed the performance of individual Teledyne-Brown employees (HT 754; ASPR 22–102.2(ii)(E)). He did not know whether BMDSCOM defined the work to be performed by Teledyne-Brown on a day-to-day basis (HT 753; ASPR 22–102.2(iii)(B)). He did not know whether payment to Teledyne-Brown was to be made solely for time worked (HT 753; ASPR 22–102.2(iii)(C)). He did not know whether BMDSCOM furnished office space or supplies to Teledyne-Brown (HT 753; ASPR 22–102.2(iii)(D)).[9] Mr. Davis had no knowledge concerning nine of the sixteen criteria.

His judgment that the Teledyne-Brown contract was one for personal services was based on only one of the ASPR criteria, that there was no concrete end product (HT 755). As noted above the testimony is to the contrary (HT 395; TT 510–511, 532). Mr. Davis himself conceded this criteria was unimportant since you can have a non-personal services contract where services are the end product. (HT 741). Nor did Mr. Davis change his testimony regarding the ASPR criteria at trial.

Mr. Davis' conclusion is unsupported by his testimony.

Analyzing the sixteen ASPR criteria, defendants' evidence was virtually unrebutted. Plaintiffs offered allegations and provided no proof. The evidence shows that the Teledyne-Brown, SETAC, contract is a non-personal services contract.

## VI. DEFENDANTS HAVE NOT VIOLATED AR 235–5 IN THE AWARDING AND ADMINISTRATION OF THESE CONTRACTS

Plaintiffs attacked the cost comparisons between contractor and Government performance of the SETAC effort. They contend that these analyses conclusively demonstrate that the SETAC function could be performed at less cost "in-house"

than under the contract. They further attempted to show that the contractor cost of both the M&S and SAI tasks far exceeded those that would be associated with in-house performance. Based on the alleged capability of the members of plaintiffs' class to perform the work and these cost differences, plaintiffs contended that defendants have violated the provisions of OMB Circular A–76, DOD Directives 4100.-33 and 4100.15 and AR 235–5, all of which govern the procurement of commercial and industrial products and services. Essentially plaintiffs contend that these regulations require the Government to perform commercial and industrial type functions internally where it is found that there will be a cost savings to the Government. With respect to AR 235–5 plaintiffs have relied specifically on subparagraphs 1–4b(2), (3) and (4) as requiring the Government to use the least costly source in securing the products and services required by the Government. They also contend that defendants failed to reevaluate the SETAC effort in accordance with other provisions of the AR (subparagraph 1–4(b)(5) and paragraph 3–3) in light of changes in program scope brought about by the SAL Agreements and Congressional funding restrictions to determine if in-house performance on the basis of cost was not now justified. They further allege that defendants have also violated the AR by using it to exceed Government personnel and salary limitations. For this they rely on paragraph 1–2d. They also state that performance of the SAI and M&S efforts was never evaluated under AR 235–5 as required in light of the commercial and industrial nature of the work and the potential saving by bringing the effort in-house.

### A. Plaintiffs Have Failed To Show These Contracts Were Awarded To Avoid Salary and Personnel Limitation.

To succeed with their argument that these contracts were let to avoid applicable

---

9. As noted above Mr. Davis later ventured his opinion that Teledyne-Brown personnel worked at the SAFEGUARD site in North Dakota. Mr. McCarter flatly denied this. And it seems strange that people working in the Systems Technology Program would be assigned to the SAFEGUARD site in an entirely separate program.

Government salary and personal limitations plaintiffs would have to show (a) that such limitations existed and applied to BMDSCOM and (b) that performing the SETAC, M&S and SAI efforts with Government civil servants would have caused these limitations to be exceeded. The salary limitations of 5 U.S.C. § 5308 apply to BMDSCOM, that is clear. Regarding personnel limitations the only "limitations" with respect to SETAC plaintiffs have pointed to stem from a decision on the part of the Defense Department not to build up a large in-house capability to perform this type work (TT 746–748). According to Major General Marshall this was one factor among many considered before concluding to contract for this effort rather than developing a Government capability (TT 747–750). This is consistent with the policy in favor of contracting out for commercial and industrial type goods and services expressed in all the regulations and directives cited by plaintiffs as having been violated.[10] Plaintiffs have failed to show in this regard that there were any overall personnel limitations which affected this decision at any level. They therefore cannot demonstrate that performing the SETAC work in-house would have caused BMDSCOM to exceed such limits and thereby, in fact, caused the choice of the contract method.

Mr. Fargason and Mr. Head testified as to the origins of the SAI contract and plaintiffs have made much of the fact that there were apparently some attempts to obtain additional Civil Service employees to support the ongoing management efforts being performed by their organization under Mr. McClung. However, there was no evidence of a specific personnel limitation on BMDSCOM, only some allusions to space availability. Further there is no evidence that the work performed by SAI was that which was already being performed in-house or that it could have been so performed. Mr. Fargason testified there was no in-house capability and that BMDSCOM personnel were managing the Bell Labs evaluation effort (TT 72–73). This remained the same even after the award of the SAI contract (TT 82). There was no showing that SAI assumed the management function performed by Mr. Fargason and Mr. Head. Mr. McClung specifically stated SAI did not perform such duties (HT 518). Again the decision to contract for these services was not made in violation of personnel ceilings but rather was consistent with the policy in favor of promoting private enterprise, especially in view of the absence of any in-house capability.

Plaintiffs in their proposed findings state that the same two witnesses attributed the need for the M&S contract to a similar inability to obtain additional Civil Service personnel to "get the job done." Both individuals admitted their former contact with the SAI effort. However, neither had any responsibilities nor did they testify as to the M&S contract and its origins. However, even if they had so testified the same analysis applicable to the SAI effort would negate the validity of plaintiffs' allegations.

While defendants cannot deny the existence of salary limitations in the hiring of civil servants, plaintiffs have not shown that defendants' purpose in letting these contracts was to avoid such limitations. The backup information to the approved comparative cost analysis which is highlighted so heavily by plaintiffs in their analysis of the SETAC costs [11] reveals no individuals being paid more than $36,000 per year, the then current Civil Service salary ceiling.[12] Looking beyond that list Mr. McCarter testified that the average salary level at Teledyne-Brown is 22% lower than that at BMDSCOM and that of the 55 people working on the 29 man years of highly technical effort only two to three individuals made more than $36,000 at that time, hardly indicative of a need to purposefully avoid Civil Service salary limitations by contracting out for this work. (TT 579,

---

10. This policy will be treated in greater detail *infra* at p. 1071.

11. See *infra* at p. 1075.

12. The ceiling has now been raised to $37,800.

595). As Mr. McCarter indicated there were other reasons why qualified individuals were unwilling to work for the Government even though the contractor salary scale was on the average lower. (TT 580, 604). Finally, plaintiffs have not demonstrated that the SAI and M&S contracts were awarded to avoid salary ceilings; nor have they introduced evidence that the salaries being paid to employees of those contractors in any way exceed such limitations.

B. *AR 235–5 Does Not Require In-house Performance Based on Comparative Costs.*

The general policy of the Government in procuring commercial and industrial products and services, as clearly set forth in OMB Circular A–76, AR 235–5 and the applicable DOD Directives, is to "rely on the private enterprise system for the products and services it needs (in preference to in-house alternatives) to the maximum extent consistent with the effective and efficient accomplishment of department and agency programs." (paragraph 2–1, AR 235–5.[13]). This same paragraph reflects the non-rigidity and flexibility of the general Army policy to be followed in these circumstances (TT 798–99):

> This policy is flexible; it gives recognition to those circumstances when it is in the national interest for the Government to operate in-house activities to provide the products and services it requires. Circumstances (*compelling reasons*) under which Federal departments and agencies *may* establish or continue commercial or industrial type activities to provide products or services for their own use are cited in paragraph 2–3. *They are exceptions to the basic policy. Establishment or continuation of in-house activities must be fully justified and related to the cited exceptions.* (emphasis added). paragraph 2–1, AR 235–5.

Before any activity can be converted to or initiated as in-house performance all other performance alternatives must be thoroughly explored and it must be determined that in-house performance is in the national interest. Paragraph 3–4b, AR 235–5. Then it must be approved by the appropriate Assistant Secretary of the Army. Paragraph 3–4, AR 235–5. In the case of the efforts involved in the SETAC, SAI and M&S contracts the responsible official would be the Assistant Secretary of the Army for Installations and Logistics. No such Assistant Secretary level approval is required to initiate or continue contract performance of commercial and industrial activities deemed to be within the purview of the regulation. (TT 800–01). Thus the AR, as do the OMB Circular and pertinent DOD Directives, vest the decision as to what method of performance will simultaneously provide the needed products and services and serve the overall national interest to management's sound discretion. While the policy mandates primary reliance on private enterprise, management has the discretion, in certain compelling circumstances, to seek approval to perform these services in-house. These special situations do not mandate initiation or conversion of all or any portion of any effort to use of Government resources. Thus even assuming a substantial portion of the SETAC effort could be performed by civil servants, as plaintiffs contend, there is nothing in the aforementioned regulations or directives which requires management to "carve up" the contract and perform certain portions in-house. The decision to impose such a management technique is rightfully left to those responsible for overseeing the programs, especially in an area of high sensitivity and defense priority such as BMD.

**13.** In acting on the FY 1976 and 7T Department of Defense Appropriations Bill the Congress recognized the flexibility provided by the contracting out policy. *Sen.Rep.* No. 94–446, 94th Cong., 1st Sess., 36–8(1975). *See H.Rep. No.* 94–517, 94th Cong., 1st Sess. 81, 264 (1975). Evidence that this continues to be OMB policy even in areas where the tasks involved are clearly performable by civil servants can be found in *Hearings on Department of Defense Appropriations for 1976 Before the Subcomm. on the Department of Defense of the House Comm. on Appropriations,* 94th Cong., 1st Sess., pt. 7, at 830 (1975).

### C. AR 235–5 Does Not Apply to the M&S and SAI Contracts.

Before addressing the AR 235–5 cost issues raised by plaintiffs concerning these contract efforts the pertinent exemptions of the AR must be examined. Two of these contracts, namely M&S and SAI, are not covered by the AR and therefore the cost contentions made by plaintiffs are inapposite. The AR (p. A–10) specifically excludes from its provisions computers integral to a combat weapon system.[14] The court noted as a matter of statutory construction that the term computer as used in that note included computer software (TT 827). Defendants produced testimony by Mr. Edwin Greiner, the Deputy Assistant Secretary of the Army whose office is responsible for the policies contained in the AR and is intimately involved in the weapon's acquisition process, concerning the scope of this exclusion. He testified that the definition of computer integral to a weapon system included hardware, software plus any effort "associated with the initial development of that software, with maintaining its currency, improving its ability to cope with a new threat, [or] modification to make it more resistant to jamming or countermeasures." (TT 863–64). Further testimony by Mr. Fargason confirmed the integral role of computers and computer software in the operation of the SAFEGUARD System. (TT 68). Earlier evidence introduced concerning the M&S and SAI scopes of work indicated both involved the computer hardware and software used in the SAFEGUARD System (HT 517–18; Affidavit of Dr. Richard E. Merwin in Support of Defendant's Memorandum in Support of Motion to Dissolve etc). Plaintiffs offered no evidence in rebuttal and therefore it must be found that, in fact, the effort included under these contracts is integrally related to a computer integral to a combat weapons system and excluded from coverage under AR 235–5 and plaintiffs contentions with respect to AR 235–5 and these contracts are irrelevant.

### D. Cost Is Only One of Many Factors in Making a Method of Performance Decision under AR 235–5.

Turning now to the SETAC effort, what factors must the manager, in fact, consider in choosing a method of performance and what relationship exists between those factors and the actual decision made? Plaintiffs' reading of the AR, as well as the OMB Circular and DOD Directives, is that where an initial comparison or subsequent review of Government versus contractor cost reveals in excess of a 10 percent saving by the former method, management must initiate or convert to in-house performance. In their minds cost is the sole factor to be considered in this context and thus the apparent cost differentials between contract and Government performance required the Army to perform the SETAC effort in-house.[15]

First the AR itself makes it quite clear that the 10% is only a "guideline" and not a

---

**14.** The entire exemption reads: Note: Automatic Data Processing functional codes W–824 through W–827 exclude computers which are integral to a combat weapon system when—
 a. It is physically incorporated into the weapon, or
 b. It is integral to a weapon system from a design, procurement and operations viewpoint, or
 c. Separate selection, acquisition, and/or management of the computer equipment is infeasible. For the purpose of this regulation, being integral to a combat weapons system means being dedicated to and essential in real time to the performance of the mission of the weapon system in combat, e. g., automatic combat command, control and communications processing for specific combat weapons. A combat weapons system is defined as an instrument of combat either offensive or defensive, used to destroy, injure or threaten the enemy. It consists of the total entity that is an instrument of combat, which may incorporate in itself a complex assembly of functional parts. Computer equipment used for logistic or administrative support of a weapons system, or which can be selected and acquired from commercial product lines and operated independent of other components of the weapons system, is not covered by this exclusion.

**15.** Obviously the same considerations would be applicable to the M&S and SAI efforts were they covered by the AR.

rigid formula.[16] Further defendants' witness Mr. Greiner, the Deputy Assistant Secretary of the Army for Installations and Logistics, reviews and approves new start applications under the terms of AR 235–5.[17] During the past year he reviewed some 40 of these applications. Mr. Greiner testified, and it must be so found, that cost is only one of many factors which must be considered in determining whether or not a particular product or service should be obtained from in-house sources. Cost is not the sole determinant of the method of performance and a straight cost based decision is not mandated by AR 235–5. (TT 802–04). Cost is but one element or parameter which goes into each management decision as to method of performance. The requirement to weigh these various factors was reiterated by the Program Manager, Major General Marshall, on cross examination. (TT 730–732). The various other factors to be considered include required training and time associated therewith, future need for the skills after the task is complete, importance or necessity for the task to be accomplished and its relationship to the rest of the activity of that organization, and the magnitude of the task (TT 802–804). In this total context the decision to approve in-house performance is weighed. The regulation itself specifically recognizes that there are decisions made based on factors other than cost. (para II, Table B–2, p. B–4). Plaintiffs have made no showing that these other factors were not present or did not enter into the decision to obtain the SETAC tasks from Teledyne-Brown in lieu of developing an in-house capability. On the other hand defendants' witnesses testified that it was precisely these types of factors which entered into the decision making process relative to the SETAC. Major General Marshall pointed to the uncertain future of these programs and the consequent concern about building up a large in-house organization. (TT 747). He also testified as to the potential disruption resulting from an in-house conversion. (TT 717–18, 20). Both sides agreed that it would have taken 3–5 years to build up the talent to perform the SETAC entirely with in-house personnel (HT 405–6, 661). Even for non-highly technical tasks it would require 90 days to a year to retrain existing Government personnel. (HT 135–58, TT 611–12). Such a conversion time would be clearly disrupting to continuity of these programs which have been given the highest national priority (TT 690, 717). Based on this evidence it must be concluded that neither AR 235–5 nor the pertinent OMB and DOD provisions mandate a performance decision based solely on cost. These other factors were proper managerial considerations in evaluating the alternative courses of initial and continuing contract action on the SETAC. Plaintiffs' contentions about dollar cost differences are irrelevant and the fact that such differences might have existed does not in and of itself constitute a violation of the governing regulations.

E. *Even Assuming Cost was the Determinant the Contractor Method was the More Economical.*

However, even assuming cost should have been the determining factor, defendants have demonstrated that the contract method of performance is the more economical method of satisfying the Government's requirements for these services. Plaintiffs, in addition to offering evidence of their own calculations of what it would cost to perform this effort in-house, have also attacked the analyses of comparative costs of performing the SETAC effort prepared by the Government in conjunction with report-

**16.** The AR states ". . . The 10 percent figure is not intended to be a fixed figure, but as a guide in assessing a confidence factor for the cost analysis. The differential may be more or less than 10 percent depending on the facts of each individual case. Paragraph 4–2c(2), AR 235–5.

**17.** A new start within the terms of the regulation is generally the establishment of new in-house activities, the reactivation, expansion, modernization or replacement of existing in-house activities. Transfer or initiation of the SETAC, M&S or SAI efforts to in-house performance would require approval of the ASA (I&L) or his deputy in accordance with paragraph 3–4 of the AR.

ing the SETAC under the inventory provisions of AR 235–5. Specifically, they noted the wide swings in percentage differences [18] between the several analyses and the unrealistic costing of the 29 man years of highly technical expertise added to the Government cost side in February 1974. Plaintiffs raised other points concerning labor overhead rates, dollar values, Government travel costs and Government telephone costs in concluding that the 1974 analyses showing savings via contract are inaccurate and inflated. With respect to the four analyses the court must find that only one, the comparative cost analysis dated 9 September 1974, was an approved, official document (HT 337, 352, TT 890). The other documents were draft CCA's of the SETAC effort. Furthermore, only one of the three drafts, the one dated 21 February 1974, was ever submitted for an approval. Both of the documents dated 1974 indicate it is cheaper to contract for these services. Defendants' cost analyst expert, Mr. Ratliff, reconciled the differences between these four documents for the court. (TT 891–898).[19] The testimony of plaintiffs' certified public accountant, Mr. White, did not contradict the reasonableness of these reconciliation explanations. In addition, plaintiffs offered no further evidence challenging or rebutting Mr. Ratliff's explanation of these differences.[20] In light of the unrebutted status of these earlier analyses as draft CCA's and the uncontested reconciliation of the differences between these studies it must be found that the approved CCA of September 1974 is the one which should be subjected to plaintiffs' contentions of inflation and inaccuracy. The chief point of attack by plaintiffs on this analysis related to the costing of the 29 man years of highly technical effort found on line 26 of that analysis.

At BMDSCOM's request the United States Army Audit Agency (USAAA) conducted an audit of the September 1974 CCA. (Plaintiffs' Exhibit 36)[21] The command asked USAAA to determine whether or not the approved CCA comported with the provisions of Chapter 4 of AR 235–5. The audit report (Plaintiffs' Exhibit 37) concluded that the CCA generally conformed to the requirements of the applicable provisions of the AR and therefore endorsed its conclusion that the contract method of performance was cheaper. (TT 440–41) Plaintiffs called to the stand the USAAA auditor who performed the review, Mr. Kent Gibbs, to attack the methodology and independence with which he conducted the audit. Plaintiffs attempted to show that the audit lacked the normal independence because Mr. Gibbs was given Mr. James Ratliff's name at BMDSCOM as an initial contact, because Mr. Gibbs did in fact on frequent occasions speak with Mr. Ratliff who had prepared his own analysis or validation of the approved CCA, because Mr. Gibbs was aware of the pendency of this litigation and had read this court's previous opinion, because the draft audit findings were reviewed with BMDSCOM, and because of certain changes between Mr.

---

18. The alleged cost difference varied from 21.-63 percent in the July 1973 draft CCA and 28.85 percent in the September 1973 draft CCA in favor of in-house performance to .24 percent in the February 1974 draft CCA and 15 percent in the September 1974 approved CCA in favor of contractor performance. All the documents were initially prepared by an individual who was not a cost analyst.

19. The court itself noted that even with respect to the erroneous September 1973 draft if full and proper adjustment for the shift of the computer alluded to in the earlier July study was made the cost differential would be reduced to 11.429 percent in favor of in-house perform-

ance, just above the 10% guideline figure prescribed in the AR (TT 942–944, 1047–49).

20. Plaintiffs contended these "post hoc rationalizations" are inadmissible evidence. This contention is addressed *infra* at p. 1085.

21. The USAAA is the Army's independent audit element, more specifically, its mission is to provide the Army at all levels with an independent and objective internal audit service which evaluates the effectiveness in which the total resources of the Department of the Army are being controlled and managed. Para 2C, AR 36–5, 8 Nov 74, Auditing Service in the Department of the Army.

Gibbs' draft and the final published version of the audit report. There is nothing unusual about Mr. Gibbs being given the name of someone to contact at the Command to initiate this audit. BMDSCOM had a standard contact point for USAAA audit activities (TT 362, 374–75). The plaintiffs made much of the fact that the individual named was Mr. Ratliff, the defendants' cost expert. They attempted to show Mr. Gibbs merely used Mr. Ratliff's conclusions in the USAAA audit report. Mr. Gibbs testified that he contacted Mr. Ratliff to gain early access to pertinent documents (TT 374–76), that he discussed the costs involved with Mr. Ratliff (TT 366) but that he obtained no input from Mr. Ratliff that he specifically used in his audit. (TT 364). It is quite logical from a professional point of view that Mr. Ratliff, who had already amassed much of the necessary source documentation, be specified as the individual to contact in this instance. This approach is consistent with Mr. Gibbs' concern that the basis of his audit would be the correct facts (TT 348–49), a principle validated by plaintiffs' own CPA (TT 483). Plaintiffs have failed to demonstrate that Mr. Gibbs' discussions with Mr. Ratliff made him the tool of BMDSCOM in conducting this audit.

Plaintiffs also made much of Mr. Gibbs' awareness of this litigation and his reading of the court's previous opinion (TT 372, 376–77). Frankly, there has been no showing how this might bias Mr. Gibbs' analysis or in fact that it did so effect Mr. Gibbs. His explanation that he reviewed the opinion solely to provide potential informational leads is logical and acceptable and demonstrative of his professional thoroughness (TT 376).

As to permitting defendants to review the draft report and the fact that changes were made between the draft and the final report, these procedures cannot be viewed as lessening the credibility of the report's contents. Mr. Gibbs stated that the purpose of affording the Command the chance to review a draft is to ensure that its conclusions are based on the correct facts (TT 348–49), an approach which constitutes good auditing practice. As mentioned above, the professional appropriateness of such a concern was confirmed by plaintiffs' own witness Mr. White (TT 483). Similarly the fact that changes might be made between a draft and final report is not extraordinary. Again plaintiffs' own CPA testified as to the occurrence of such revisions in his own business experience (TT 494–97). The plaintiffs have not proven in these facts a bias or direction which would discount or discredit the findings of the USAAA report with respect to the approved CCA.

Plaintiffs also attacked Mr. Gibbs' costing methodology in conducting this audit. The key criticism raised dealt with the costing of the 29 man years of highly technical effort on line 26 of the approved CCA.[22] These were the services the Government determined it would still have to contract for even if the rest of the SETAC effort could be brought in-house.[23] Plaintiffs have failed to show that such a contract in fact would not have been required. Their own witness, Mr. Sadler, recognized that these highly technical tasks had to be performed by Teledyne-Brown, or some other similar contractor, and that it would take 3–5 years to bring the entire SETAC effort in-house if possible. (HT 125, 127, 135). Plaintiffs contend that a fully loaded figure of $58,000 per man year rather than the $80,000 per year used was a more accurate depiction of Teledyne-Brown's cost experience. The former figure, which plaintiffs called the actual costs preferred under AR

---

**22.** Plaintiffs also raised questions about travel and communications costs, overhead rates and non-inflated labor rates. However, even assuming these costs would have been revised in accordance with plaintiffs' contentions, this would not affect the conclusion that the contractor method was the appropriate choice under the circumstances.

**23.** There was testimony by Mr. Gibbs that this item was not supported by documentation other than the contractor's cost estimate. However, Mr. McCarter on cross-examination related the discussions with Brigadier General Egbert, then the Director of the Site Defense Project Office, as to the need for these services. (TT 637–38).

235–5, was computed by Mr. Gibbs using the 29 highest paid Brown labor categories listed in the backup materials to the approved CCA. The $80,000 was extracted from a letter from Brown to BMDSCOM quoting an estimated cost for this level of effort (Plaintiffs' Exhibit 34) and was verified by Mr. Gibbs by examining several contracts for similar highly technical effort (TT 410–12). Mr. Gibbs made it clear that he did not consider the 29 man years of highly technical effort the equivalent of the 29 highest paid individuals (TT 424, 442). He testified:

> $58,000 represented the 29 personnel that were the highest paid that was presented in this CCA for the Brown Engineering SETAC effort, those 29 personnel do not constitute what the 29 "man years of effort" required to be contracted out if this were brought in-house. They are not comparable. (TT 442).

This was confirmed by the individual who prepared the quote, Mr. McCarter, (TT 558–60) as the basis for the difference in the two costs. In fact, for the services being requested by defendants there were no actual costs, no actual experience because Teledyne-Brown had never solely supplied the 29 man years of highly technical expertise. In this light it must be found that a contractor estimate compared with several actual contracts is reasonable information to rely on in verifying the propriety of the costs.[24] Therefore, the plaintiffs' criticism of Mr. Gibbs reliance on the $80,000 figure is unfounded. As testified by plaintiffs' own CPA (TT 482–488) cost accounting involves the application of accounting principles and techniques using professional judg-

ment. Plaintiffs have not demonstrated that Mr. Gibbs acted unprofessionally in the conduct of this audit and that therefore his conclusions are invalid and should be rejected.

To further establish validity of the costs reflected in the approved CCA, Mr. Ratliff, defendants' cost expert, performed an independent validation study of the costs and conclusions contained therein.[25] Based on his review Mr. Ratliff developed a set of cost figures which he considered to be validated. In performing his study it is noteworthy that Mr. Ratliff surfaced some of the same errors pointed out by plaintiffs' evidence.[26] Using the same assumptions applied to the original CCA Mr. Ratliff concluded that the variance in favor of contractor performance should be adjusted downward to 9.8 percent. He confirmed, however, that the CCA's conclusion was accurate and that contractor performance was in fact more economical.

In addition, Mr. Ratliff questioned two of the assumptions of the CCA. First he questioned the one-to-one man year relationship between technical personnel on the Government's side versus those on the contractor's side. Mr. Ratliff testified that there is a difference in the number of hours per man year between contractor and Government personnel.[27] In a level of effort contract such as the SETAC where the Government is purchasing a number of man years this difference means the cost comparison cannot be based on a one-to-one basis. Plaintiffs offered no testimony to refute this showing. Using the validated figures as a base and making an adjustment for the man-hour difference increased the percent-

---

**24.** In performing his validation of the approved CCA studies Mr. Ratliff considered additional contracts for similar effort beyond the CALSPAN and TSC procurements mentioned by Mr. Gibbs. One of them, another contract with CALSPAN for 31 man years of effort in connection with the B–1 bomber program worked out to approximately $85,000 per man year.

**25.** The validation consisted of a detailed review of the costing guidelines in Chapter 4 of AR 235–5, a review of the methodology, cost, and assumptions used in the CCA, tracking of the cost figures and assumptions back to the

source documents and contract files and finally a trend analysis going back into prior studies.

**26.** Specifically he mentioned understated contractor costs due to inappropriate overhead rate and use of non-inflated dollars. On the Government side travel costs were understated and communications costs overstated. (TR 905).

**27.** The contractor gets 1860 manhours per man year while the Government gets 1746 manhours per man year.

age in favor of contracting out to 13.38 percent (Defendants' Exhibit 16). This additional Government cost consideration should have been included in the CCA and would increase the cost advantage in favor of contract.

The second assumption questioned by Mr. Ratliff was the failure to allow for any contract-overlap or training/orientation costs in the approved CCA. The plaintiffs' own expert witness, Mr. Sadler, recognized the need for some period of retraining during any transition to in-house effort.[28] The plaintiffs strongly contested the validity and admissibility of Mr. Ratliff's conclusions. However, the court must be hard-pressed to discard the need for some cost adjustment due to retraining time in the face, of admissions by plaintiffs' own witness that 90 days to one year would be required. (TT 135). This minimum period was confirmed by Mr. McCarter who indicated that in most instances it would take more time (TT 612). Mr. Ratliff assumed that during the transition from contractor to in-house performance the contract effort would have to continue to avoid disruption of program performance. Stripping out all of the administrative people, who would need no training whatsoever, and using a three month period of contract overlap, which is clearly reasonable in light of the testimony, Mr. Ratliff calculated that the additional cost on the Government side would increase the percentage in favor of going contract to some 33.28 percent.[29] When both of these assumptions are applied to the approved CCA it increases the variance in favor of contracting for these services to 37.5 percent. Plaintiffs have offered no evidence to counter the need for some adjustment to the approved CCA, or for that matter any of the earlier draft analyses, to compensate for the manhour difference or some quantum of training time. Applying these adjustments to the approved CCA as well as the earlier draft CCA's, all the percentage variances are either in favor of contract performance or fall within or acceptably close to the 10 percent differential guideline prescribed by AR 235-5 (see Note 19 *supra*).[30]

In attempting to undermine the validity of Mr. Ratliff's efforts, plaintiffs focused primarily on the costing of the 29 manyears of technical effort on line 26 of the approved CCA. While the requirement for this technical effort was deemed to be inadequately documented by Mr. Gibbs (TT 436, 440) Mr. McCarter testified as to the discussions with Brigadier General Egbert who concluded that, in fact, if the defendants tried to bring the SETAC effort in-house some level of highly technical expertise would have to be acquired by contract either permanently or for some period of time. (TT 637–38). Plaintiffs have neither demonstrated that the requirement itself was invalid nor that the 29 man year level was excessive.[31] The level of technical ex-

---

**28.** Mr. Sadler thought that the highly technical analysis to be accomplished by the SETAC would never have been done in-house (TT 135). At the same time with respect to the other Brown managerial and technical personnel he thought that "in-house people could be retrained in 90 days to one year to do most of these functions." (TT 135).

**29.** The calculated dollar addition was $1,231,-547 (Defendants' Exhibit 17).

**30.** For example, applying these two factors to the September 1973 draft study which indicated a 28.85 percent variance in favor of in-house performance would reduce that figure by an equivalent or even greater amount (because of the greater number of manyears used in this earlier draft CCA). The variance would be reduced to 2.15 percent or less in favor of in-house performance, well within the 10 percent guideline prescribed by AR 235-5.

These calculations do not include other actual non-incremental costs which would accrue to the STP but which are not included under the AR 235-5 costing methodology such as charges for additional rent and security and administrative personnel now allocated to that program. (TT 577–78).

**31.** Again Mr. Sadler's testimony at the hearing on the preliminary injunction indicated that the SETAC provided certain analytical capabilities that never would have been done in-house (HT 135–6). This requirement was certainly further confirmed by testimony of defendants' witnesses, Mr. Fendley (HT 407–08), Mr. McCarter (TT 637–38) and Major General Marshall (TT 715–17, 749–50). This type of technical analysis was, in fact, being provided under the SETAC scope of work (TT 510, 517, 532–34, 601, 603).

pertise required is clearly a matter of judgment for those intimately familiar with the STP and the SETAC effort. It is not for the court to superimpose its own views as to the procurement needs of the Government. However, even were the court to question the need for 29 man years level of effort, the contractor method of performance would still be more economical. Defendants demonstrated the degree of sensitivity of the percentage difference between in-house and contractor performance to a variation in the 29 man year level. Even if the 29 man year level is reduced in several stages to 10 man years of effort, the difference between the two performance methods still falls within the 10 percent differentiation guideline provided by AR 235–5.[32] When omissions relative to hours per man year and training costs are incorporated this fact holds true even assuming the man years are costed at $58,000, the figure plaintiffs argued so forcefully reflected actual costs required to be used by AR 235–5 (TT 929–30).

In attacking Mr. Ratliff's analysis plaintiffs again challenge the costing of the 29 man years of technical effort. They again question why the cost figure for the 29 highest paid Brown employees, also calculated by Mr. Ratliff to be some $58,000, was not used in the CCA as the preferable actual cost prescribed by AR 235–5 instead of the $80,000 figure quoted by Teledyne-Brown.[33] The same reasoning that applied to plaintiffs' criticism of Mr. Gibbs' use of the $58,000 figure governs here. The quote requested for 29 man years of highly technical expertise was not the equivalent of requesting the 29 highest paid Teledyne-

Brown employees. This was established by the earlier testimony of Mr. Gibbs and Mr. McCarter (TT 442, 558–60). There were substantially more than 29 Teledyne-Brown employees working on the SETAC effort overall. (Defendants' Exhibit 9, TT 605). Further, Mr. McCarter testified that some 55 Brown people were working on the 29 man years of highly technical effort at that time (TT 573–74). Based on this it must be concluded that the loaded cost of the 29 highest paid Brown employees cannot be equated with the cost of these 29 man years. Further, Teledyne-Brown had not been providing only 29 man years of highly technical effort. The level of effort under the SETAC scope of work in connection with the approved CCA totaled 129 man years, including other than just the highly technical work which was the subject of the Teledyne-Brown quote. (Plaintiffs' Exhibits 45, 51–54, TT 999–1001, 1004). Thus even if there were an equivalency between the 29 highest paid and 29 highly technical man years the difference in work parameters between the contractor cost proposal, reflecting its actual experience under the contract, and the proposal for 29 man years would mitigate against using the former as a basis for predicting the cost of the latter.[34] In this sense then the court must find that there were no actual cost data, within the meaning of AR 235–5, available to the Government for use in comparing Government to contractor cost. To verify the $80,000 quote made by Teledyne-Brown in their letter of 19 September 1974 Mr. Ratliff did use contracts for similar type effort at varying man year levels with similar type contractors.[35] These demonstrated

The failure of either Mr. Gibbs or Mr. Ratliff to question this requirement does not affect the validity of their conclusions. It is not their job to question the requirement, only the costing methodology or assumptions. (TT 985–86).

**32.** The excursions were applied to the validated CCA without allowance for the hours per man year difference and training period assumptions mentioned *supra* at p. 1076. (TT 927–28)

**33.** Relative to the concern about Mr. Ratliff's alleged influence over USAAA's audit report

the court notes that the $58,000 figure was arrived at by Messrs. Ratliff and Gibbs through decidedly different procedures (TT 976–77).

**34.** The court notes that even using this $58,000 figure and applying it to the defendants' validated CCA there is still a 3.66 percent differential in favor of going contract. (TT 929).

**35.** Mr. Ratliff examined contracts with CAL-SPAN, TSC and Aerospace (TT 951, 1005–6).

the reasonableness of the Brown quote. Therefore for this key element of cost the court must find Mr. Ratliff's judgments to be justifiable. The court cannot conclude, in this light, that the Government's validation of the approved CCA is tainted evidence and that its conclusion is unacceptable. Mr. Ratliff performed an independent, internal analysis to determine the reasonableness and validity of the figures and assumptions contained in the approved CCA. In the course of his analysis he applied the principles of AR 235–5 and his professional judgment in a logical, rational fashion not arbitrarily or capriciously. The conclusions of the validation that contractor performance was the cheapest method to obtain these services must be accepted.

## CONCLUSIONS OF LAW

This suit is brought under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, to obtain a declaration of rights and legal relations, including a declaratory judgment, and order for temporary, preliminary, and final injunctive relief, and such other relief as may be necessary and proper. The complaint asserts jurisdiction of this controversy by virtue of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and 28 U.S.C. §§ 1391 and 1331(a).

## I. THE MATTERS PRESENTED ARE COMMITTED TO AGENCY DISCRETION

■ The Administrative Procedure Act (APA) provides for the review of an agency's actions except where [(a)(1)] statutes preclude judicial review or [(a)(2)] the agency action is committed to agency discretion by law. The ability of this court to review managerial decisions involving military matters and national defense has been properly circumscribed. In *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1954) the Supreme Court cautioned that ", [j]udges are not in the business of running the Army . . . Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to interfere in judicial matters." 345 U.S. at 93–4, 73 S.Ct. at 540; *see Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1974). Judicial intrusion in the procurement process has also been narrowly prescribed. Responsible executive officials must be given broad discretion in procuring supplies and services for the Government. Constant judicial intervention to review the merits of a particular procurement decision would unduly burden the managerial effectiveness of the executive branch.[36] *Perkins v. Lukens Steel,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *see, Allen M. Campbell Co., General Contractor, Inc. v. Lloyd Wood Construction,* 446 F.2d 261, 264 n. 5 (5th Cir.1971); *Gary Aircraft Corporation v. United States,* 342 F.Supp. 473, 477–78 (D.Tex.1972); *see also Morgan Associates v. United States Postal Service,* 387 F.Supp. 947, 950 (S.D.N.Y. 1975). The line of authority in the US Courts of Appeals proceeding from *Scanwell Laboratories v. Shaffer,* 137 U.S.App. D.C. 371, 424 F.2d 859 (1970)[37] and followed by the Fifth Circuit in *Hayes International Corporation v. McLucas,* 509 F.2d 247 (5th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975) recognized a limited exception permitting the courts to review complaints of disappointed bidders concerning the conduct of the specifically prescribed bidding and award process set forth in ASPR. The plaintiffs' reliance on this exception to the normal proscription against interference in the procurement

---

**36.** That plaintiffs are asking this court to become intimately involved in the judgments inherent in the procurement process is unquestionable. Plaintiffs have asked the court to determine the appropriateness of particular types of contracts and the meaning of the terms "specific" and "memorandum" in the context of the ASPR.

**37.** *See* e. g. *Cincinnati Electronics Corporation v. Kleppe,* 509 F.2d 1080 (6th Cir.1975), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1973); *William F. Wilke v. Department of the Army,* 485 F.2d 180 (4th Cir.1973); *Merriam v. Kunzig,* 476 F.2d 1233 (3rd Cir.1973), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973).

process is inapposite here where the facts do not involve disappointed bidders or any fairly comparable situation.

Furthermore, even if the fact here were similar to those found in *Scanwell* and its progeny, this case involves procurement decisions in programs and areas which are not subject to review even at the request of disappointed bidders under the *Scanwell* line of authority. Major General Marshall, the current Ballistic Missile Defense Program Manager, testified in detail as to the intimate relation between BMD efforts and US national defense and Foreign policy objectives. Especially noteworthy was his description of the role BMD played in the 1972 SAL negotiations (TT 687–90) and the future role of BMD, including the STP, in our national defense posture (TT 691–93). These are programs which have been given the highest procurement priority rating because of their sensitivity and importance to national defense. (TT 690). He also testified as to the high level personnel who participated in the discussions and reviewed the considerations preceding the selection of the contract method of obtaining these services. (TT 713–17). Plaintiffs' own witness, Mr. Sadler, alluded to the relationship between changes in American foreign policy and the SETAC function (HT 131–32).

It is precisely this type case which this Circuit warned of in *Hayes International Corporation v. McLucas, supra*:

> In the matters such as the one before us in this case, where the procurement decision touches on weapons systems which may have a vital impact on national defense, the courts must be wary of intruding into areas where they have neither special competence nor the ability to act expeditiously. . . . *Id.* at 257.

The evidence presented places these programs and the procurement decisions appurtenant to their management within the sound discretion of the Department of Defense and not subject to judicial review and interference. *Curran v. Laird,* 136 U.S. App.D.C. 280, 420 F.2d 122 (1969); 5 U.S.C. § 701(a)(2) (1970); *see also Concerned About Trident v. Schlesinger,* 400 F.Supp. 455, 483 (D.D.C.1975).[38]

Earlier, the Fifth Circuit in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir. 1971) established standards for determining whether judicial review of military decisions is appropriate in a particular case. As a predicate for review of internal military affairs, the Court held plaintiffs must allege the deprivation of a constitutional right or military action in violation of its own regulations. Plaintiffs fail on this count. As explained above and below plaintiffs have no property interest in Federal employment during the existence of contracts which violate regulations, and the decisions and judgments to be made under the regulations are committed to agency discretion. Moreover, the regulations, ASPR XXII, AR 235–5, and the DOD Directives provide no benefits to plaintiffs. They are for the benefit of the Army. *Silverthorne v. Laird,* 460 F.2d 1175 (5th Cir. 1972). Thus, their violation, *vel non,* is unreviewable. Accordingly, plaintiffs have no entitlement to judicial review of the decision to enter or extend the contracts in question.

Even assuming plaintiffs can overcome the threshold determination, analysis of the *Mindes* standards precludes review. *Mindes* requires the court to weigh four factors before reviewing a challenged military decision.

---

**38.** The court must conclude that even if these actions did not involve programs intertwined with foreign and national defense policy and the Army had departed from the provisions of its own regulations it would not necessarily give this court the province to review these matters. Plaintiffs have failed to show that the regulations and directives they contend have been violated confer any procedural benefit or individual right of action on their behalf. In the absence of such a showing plaintiffs' complaints would not be entitled to review. *American Farm Lines v. Red Ball Freight,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1969); *Associated Press v. FCC,* 145 U.S.App.D.C. 172, 448 F.2d 1095 (1971). This aspect of justiciability is treated further in the subsequent discussion relative to plaintiffs standing to sue. *See infra,* p. 1082.

The first factor is the nature and strength of plaintiffs' claim with constitutional claims entitled to greater weight than those with a statutory or regulatory base. *Mindes* at 201. As already noted, plaintiffs' only constitutional claim, deprivation of a property interest without due process of law, is unsupported. None of the statutes or regulations on which they rely entitle civil servants to remain on the Government's rolls during the life of contracts which violate regulations. Their regulatory claims likewise are unreviewable. The regulations confer no benefits upon civil servants and in fact are for the benefit of the Army. Consequently, the first factor weighs in favor of defendants and against review.

 The second factor to be weighed by the court is the potential injury to plaintiff if review is refused. *Id.* at 201. At first blush it appears that denial of review would have a significant impact upon plaintiffs. However, upon closer review the impact is nonexistent. Assuming this court found violation of ASPR XXII, plaintiffs would be entitled to no relief. *See infra* p. 1088. This is true for the remedy for such violation would not be continued employment, as plaintiffs suggest, but rather correction of the challenged practice or a change in the contract documents. Secondly, defendants cannot have violated AR 235-5 for two reasons. The work is being performed by private enterprise which is the rule to be followed under that regulation as well as OMB Circular A-76. The decision to perform in-house, the exception to the rule, is a decision which must be made in the national interest, para 3-4. b.(1) AR 235-5, considering a host of factors of which cost is but one. (TT 802-804). Therefore, assuming contracting is more costly than in-house performance, nothing in the regulation mandates in-house performance. Hence, plaintiffs have not been harmed regardless of their allegations.

The third factor is the type and degree of interference with the military function; if relief would seriously impede vital military duties, relief should be denied. *Mindes* at 201. In this case the interference affects the nation's ballistic missile defense program. It is difficult to imagine interference with a duty more vital than the development of a defense against intercontinental ballistic missile attacks. Yet, plaintiffs seek review of how best to accomplish this critical mission. Plaintiffs contend that performing 70 percent of the SETAC effort in-house would have little or no impact upon this crucial aspect of our national defense. (Plaintiffs' Proposed Conclusions of Law, p. 60). They also contend that bringing this effort in-house would enhance military readiness. *Id.* To support these contentions they rely on the testimony of Glen Sadler who had no managerial responsibilities regarding the Site Defense Program (now System Technology Program) (HT 391). They ignore the manner in which the decision was made at the highest Army and Defense levels (*see* Defendant's Exhibit 12; HT 713-714), and they apparently feel the testimony of General Marshall, the man responsible for the Army's BMD programs, is entitled to no weight. General Marshall in fact testified that converting to in-house performance would have a drastic, disruptive impact on this critical national defense program. (HT 717, 718). General Marshall and Mr. Greiner both testified about the myriad considerations involved in deciding whether to follow the exception to reliance on private enterprise. In such cases as this, the decision of how best to perform the mission must be left to the experts. *See Curran v. Laird, supra.* Certainly, in view of the testimony this factor weighs overwhelmingly in favor of defendants.

The fourth and final factor also favors defendants and weighs against review. The fourth factor is the extent to which military expertise is involved. *Mindes supra* at 201-202. In the case at bar, military expertise at the highest levels went into the decision of how best to perform the Systems Technology mission. (Defendants' Exhibit 12). Moreover, General Marshall testified that the decision of the appropriate civil servant-contractor mix was a delicate question which depended on consideration of many factors, and the decision is one

which must be made on an individual basis (HT 704–706).

Consideration of how best to perform the military mission is left to the discretion of military experts with the general rule being to rely on private enterprise. Para 2–1a., AR 235–5. However, the flexibility there described permits exceptions depending on the national interest. Para 2–3, AR 235–5. The decisions in this case, to rely on private enterprise to perform this vital military mission, must be left to military experts such as Mr. Greiner and General Marshall.

The military expertise involved in the decision to perform by contract in this case is considerable. That plaintiffs seek to dispute the decision of how best to deploy in the event of a Soviet abrogation of the SAL Agreements (Plaintiffs' Proposed Conclusions of Law, p. 60), demonstrates that the decision indeed requires the superior knowledge and experience of military professionals.

This court is in no position to superimpose its judgment for the Army decisions challenged by plaintiffs. The *Mindes* factors prohibit relief in this case.

■ Plaintiffs cited numerous cases indicating expansive judicial review of military activities (Plaintiffs' Proposed Conclusions of Law 56–62). These cases, they contend, indicate that whenever there is a *prima facie* showing of arbitrary or capricious action the courts have a right to review that contention and render a decision on the merits. All these cases dealt with military personnel alleging arbitrary or capricious treatment under regulations promulgated and issued for their benefit. However, those same cases recognize that not every alleged violation of a military regulation gives a serviceman, much less a civil servant, a justifiable claim. *Cortright v. Resor,* 447 F.2d 245 (2d Cir.1971), *cert. denied* 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972). Where a military regulation is designed simply to promote in the judgment of responsible officials the efficient functioning of the military establishment this does not give the serviceman "a ticket to the courthouse." *Id.* at 251; *All-*

*good v. Kenan,* 470 F.2d 1071, 1073 (9th Cir.1972). This Circuit has recognized that precise distinction in *Silverthorne v. Laird, supra,* in dealing with an Army regulation specifically related to the retention of military personnel. The regulations and directives plaintiffs allege have been transgressed are not directed at individuals or military personnel policies. They are essentially managerial and policy directives governing the procurement of goods and services to satisfy Government requirements. As such they provide no private legal right of action nor do they remove such activities from the traditional position they occupy as soundly committed to agency discretion. *Independent Meat Packers v. Butz,* 526 F.2d 228, 236 (8th Cir.1975); *Kuhl v. Hampton,* 451 F.2d 340 (8th Cir.1971). The court, therefore, must conclude that defendants' actions are exempt from judicial review under the provisions of the APA. 5 U.S.C. § 701(a)(2)(1970).

The decisions herein are committed to agency discretion by law; however, even if they were not, the judicial review would be improper. *Hayes International; Mindes; Curran;* all *supra.*

## II. PLAINTIFFS LACK STANDING TO PURSUE THIS MATTER

■ Defendants contend that plaintiffs have not demonstrated the requisite standing to maintain this action. To show standing plaintiffs must first allege and be able to prove that the challenged action has caused them injury in fact, economic or otherwise. Secondly, they must be able to show that the interest they seek to protect is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The court must conclude that they have satisfied neither of these tests.

■ With regard to the first element of standing plaintiffs made general allegations

that but for these contracts there would be in-house jobs available for them to bump and retreat into and that therefore their injury was in fact caused by the letting of these contracts. However, the court must find that plaintiffs have not sufficiently demonstrated capability of the members of plaintiffs' class to perform the work. (*See supra* at p. 1053.) Further plaintiffs have not shown that absent these contracts the work would have in fact been done in-house at BMDSCOM. Major General Marshall testified as to the various alternatives to contract such as Federal Contract Research Centers and private, nonprofit corporations such as SANDIA Laboratory (TT 717). AR 235–5 itself sets forth sources other than contract and in-house.[39] In the light of this evidence the court must conclude that plaintiffs have failed to draw the line of causation between their alleged injury in fact and defendants' actions necessary to establish their standing to maintain this action. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Linda R.S. et al. v. Richard D. and Texas et al.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

▮ As to the zone of interests element of the current standing test, plaintiffs have asserted that their interests are protected by the provisions of OMB Circular A–76, DOD Directives 4100.33 and 4100.15, AR 235–5 and the ASPR. These regulations and directives constitute managerial and policy tools to aid in the procurement of supplies and services for the Federal Government and military services. They are not intended to provide benefits to plaintiffs. See *Kuhl v. Hampton, supra*. Rather they have been promulgated to promote the efficient functioning of the military establishment and the economy of the service. *See Independent Meat Packers v. Butz, supra* ; *Allgood v. Kenan, supra* ; *Sil-*

verthorne v. Laird, supra ; *Cortwright v. Resor*, 447 F.2d 245, 251 (2d Cir.1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

▮ Such regulations do not constitute a relevant statute for plaintiffs within the meaning of the APA. *See Pullman Incorporated v. Volpe*, 337 F.Supp. 432, 440 (E.D. Pa.1971). Further, these regulations and directives provide no implied private right of action to the plaintiffs to enforce their provisions. *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *Acevedo v. Nassau County*, 500 F.2d 1078, 1082–84 (2d Cir.1974); *Farkas v. Texas Instrument Corporation*, 375 F.2d 629, 633 (5th Cir.1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).

Plaintiffs relied heavily on *Lodge 1858, American Federation of Government Employees v. Paine*, 141 U.S.App.D.C. 152, 436 F.2d 882 (1970). The court therein pointed to the NASA enabling legislation in concluding that plaintiffs had successfully passed the "zone of interests test." (42 U.S.C. § 2451 et seq. (1970). It specifically required all NASA positions to be filled in accordance with the civil service laws except for 425 scientific and engineering personnel. (42 U.S.C. § 2473 (b)(2)(1970)). Plaintiffs' counsel argued that 10 U.S.C. § 1581 is a similar statute which gives plaintiffs standing to sue in this case. However, the latter statute permits the appointment of a certain number of professional and scientific personnel in accordance with Civil Service laws. These appointees are classified civil servants. It does not limit the authority of the Defense Department to contract for the performance of scientific tasks. In fact its limitations are consistent with the policy in favor of contracting out for the commercial and indus-

---

**39.** Paragraph 1–1, AR 235–5 provides for the following sources;

 (1) Procured from commercial or industrial sources.

 (2) Provided by Army-operated in-house activities (commercial or industrial-type activities).

 (3) Obtained from other Federal departments and agencies (interservice/Department/agency support), or

 (4) Acquired by a combination of two or more of the above alternatives.

trial type needs of the Federal Government. There is no evidence that it was intended to protect plaintiffs in this context as was the NASA enabling legislation.

■ Plaintiffs also rely on the rights of third parties, those Federal employees who would have performed these jobs if the effort had been done in-house, in asserting their claims. These are the jobs into which they allege they then could "bump and retreat." Plaintiffs, in essence, claim they have been denied the benefits of positions to which they could have been appointed. It is the established rule that one is not entitled to the benefit of a position until he has been duly appointed to it. *United States v. Testan and Zarilli,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Plaintiffs cannot rely on the illusory rights of themselves or third parties to these jobs as a basis for maintaining this action. *See* e. g. *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943).

### III. THIS COURT'S SCOPE OF REVIEW IS VERY LIMITED

■ Even assuming the defendants' action with respect to these contracts were subject to judicial review, the scope of that review would be limited under the terms of pertinent provisions of the Administrative Procedure Act. 5 U.S.C. § 701 *et seq.* It is inappropriate to subject the merits of these procurement decisions to a de novo review at trial. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1972); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Bank of Commerce of Laredo v. City National Bank of Laredo,* 484 F.2d 284 (5th Cir.1973). The standard which this court must apply to defendants' actions is whether, in light of regulatory requirements, there is a rational and defensible basis for the determination to let these contracts and the manner in which they have been admin-

istered. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Udall v. Washington, Virginia, Maryland Coach Company,* 130 U.S.App.D.C. 171, 398 F.2d 765 (1965). So long as defendants did not act arbitrarily and capriciously in the exercise of their authority to proceed with the development of these BMD programs it is not this court's province to upset those decisions. *Schwartz v. Secretary of the Treasury,* 364 F.Supp. 344 (D.D.C.1973); *Zabel v. Tabb,* 296 F.Supp. 764 (M.D.Fla.1969), *rev'd on other grounds,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). As the court noted a showing of arbitrary and capricious actions is a heavy burden (HT 731). Based on the evidence presented the court cannot find that defendants have transgressed these standards and acted irrationally or in an arbitrary or capricious fashion.

■ The plaintiffs raised many allegations concerning defendants' compliance with AR. 235–5 and the ASPR. All these managerial decisions in the area of personal services determinations under the ASPR and the application of the provisions of the AR required the exercise of judgment and discretion on the part of defendants. Defendants' witnesses described the type of deliberations and considerations which preceded the exercise of these judgments.[40] Plaintiffs do not dispute this. Their own expert witnesses admitted that determinations in these areas are largely judgmental and reasonable men can certainly differ in their judgments. (TT 324–325, 482–484). The court also may have its own judgments on these decisions relative to the method of performance, the interpretation of the applicable regulations and the administration of these contracts thereunder. However, it is not for the court to substitute its own judgment for that of the defendants. *United States v. Joseph G. Moretti, Inc.,* 478 F.2d 418 (5th Cir.1973); *Aguayo v. Richardson,* 473 F.2d 1090 (2d Cir.1973), *stay denied,* 410 U.S. 921, 93 S.Ct. 1350, 35 L.Ed.2d 583 (1973), *cert. denied,* 414 U.S.

---

40. TT 13–15 (Mr. William O. Turney); TT 683, 715–717, 727–728, 731–732 (Major General Marshall); TT 802–04, 844, 897 (Mr. Edwin Greiner).

1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974); *Kendler v. Wirtz*, 388 F.2d 381 (3rd Cir. 1968); *Cobb v. U. S.*, 240 F.Supp. 574 (W.D. Ark.1965). Nor is it for this court to apply its own interpretation of these regulations so long as the interpretation applied by the promulgator is reasonable, even though that interpretation may not appear as reasonable as some others. *Brennan v. Southern Contractors Services*, 492 F.2d 498 (5th Cir.1974); *Roy Bryant Cattle Co. v. United States*, 463 F.2d 418, 420 (5th Cir.1972); *Allen M. Campbell Co., General Contractors, Inc. v. Lloyd Wood Construction Co.*, 446 F.2d 261, 265 (5th Cir.1971). Therefore the court must conclude that the defendants' interpretation that the provisions of AR 235–5 do not apply to the M & S and SAI contracts is reasonable and valid. Further the court must accept the testimony of defendants that cost is one of numerous factors to be considered under AR 235–5 and conclude in this light that even if plaintiffs had successfully demonstrated the contractor method of performance was more expensive that AR 235–5 does not mandate in-house conversion. Even if the court were to find the AR to require a cost based decision, defendants have conclusively shown that the contractor method was, in fact, the more economical. Therefore, continuation of the SETAC effort is not in violation of AR 235–5. Plaintiffs argue that defendants have engaged in impermissible *post hoc* rationalization by presenting evidence to reconcile the draft and validate the approved CCA's and cite *Burlington Truck Lines v. U. S.*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) and *SEC v. Chenery Corporation*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The key holding in those cases was that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained. In other words, the agency cannot come in at trial and suddenly offer a new reason for their actions. Defendants have not done so here. Mr. Rat-

liff offered no new supplementary reasons for BMDSCOM's continuation of the SE-TAC effort. The reason for BMDSCOM's actions continued to be the approved CCA of September 1974. Mr. Ratliff only rendered expert explanatory testimony as to the underlying bases and validity of that reason. Such explanatory testimony is recognized by one of the cases cited by plaintiffs. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *See also Dunlop v. Bachowski, supra*, 421 U.S. 560, 95 S.Ct. 1851, 44 U.S.L.W. at 4673. In addition he testified to no more than that permitted to plaintiffs' CPA, namely the differences between figures and their reasonableness. Even assuming there was some element of *post hoc* rationalization present here, the Supreme Court in *Overton Park* did not totally proscribe use of *post hoc* rationalizations but indicated that in and of themselves they do not constitute the "whole record" complied by the agency—the basis for review required by the APA. 401 U.S. at 419, 91 S.Ct. 814. Therefore the court must consider defendants' evidence as to the CCA as admissible and entitled to substantial weight.

Finally, with respect to alleged personal services elements of these contracts, the ASPR states that, "there are no definitive rules for characterizing particular services as 'personal' or 'non-personal'. There are many factors involved, all of which are not of equal importance. The characterization of services in a particular case cannot be made by simply counting factors, but can only be the result of a balancing of all the factors in accordance with their relative importance." ASPR 22–102.2. It then lists 16 indicia of personal services contracting. Plaintiffs' expert witnesses, Mr. Davis and COL Brackett, pointed to two or three of these factors in arriving at their conclusions that there were personal services elements in these contracts.[41] On the other hand the defendants were successful in showing that a majority of the most persuasive ASPR

---

**41.** It should be noted that plaintiffs' so called "expert" witnesses have had little or no recent experience in applying ASPR or in making personal service determinations thereunder (TT 286, 1152).

factors, such as those found to exist by the Civil Service Commission in some of the contracts involved in the *Lodge 1858, American Federation of Government Employees v. Paine* case,[42] were not present. Further, some of the factors pointed to by plaintiffs' witnesses were not even included in the list of factors.[43] Based on the evidence the court must conclude that it cannot overturn the judgmental determination by the contracting officer that the awarding and administration of these contracts constitute violation of the ASPR limitations on such contracts.

## IV. PLAINTIFFS HAVE NO PROPERTY INTEREST IN EMPLOYMENT DURING THE EXISTENCE OF CONTRACTS AWARDED OR CONTINUED IN VIOLATION OF REGULATIONS

Plaintiffs' claim is that they have a property interest in the right to compete for jobs of persons whom they claim should have been appointed to civil service jobs. They claim that if BMDSCOM had not contracted with M & S Computing, SAI and Teledyne-Brown Engineering, civil servants would have been hired to perform that work.[44] If civil servants had been hired to perform that work, then they would have been entitled to compete for those jobs under RIF procedures. 5 C.F.R. Part 351. However, plaintiffs have pointed to no statute or regulation which secures them the right to employment during the existence of contracts entered into in violation of regulations.

In fact the Supreme Court has recently indicated that plaintiffs do not have the property interest they describe. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). There two GS–13

civil servants claimed that they were entitled to be GS–14's. *Id.* at 950. The court was careful to note that Testan's claim was not that he had been denied the benefit of a position to which he had been appointed. *Id.* at 952. Rather, plaintiffs there claimed entitlement to a position to which they should have been, but were not appointed. *Id.* The court reaffirmed the rule that "one is not entitled to a position until he has been duly appointed to it." *Id.*

Plaintiffs' claim is further removed. Here, plaintiffs claim that civil servants, not themselves, should have been appointed to perform the work put under contract to M & S, SAI and Teledyne-Brown. And if others had been so appointed, plaintiffs would have been entitled under reduction in force procedures, to compete for the appointments of those other civil servants. Under *Testan, supra*, plaintiffs are twice removed. They base their entitlement on the lack of appointment of third parties. *Testan* clearly stands for the proposition that the property interest here sought, appointment to the positions that others should have had first, is nonexistent. The appointment comes before the property interest, not vice versa.

■ The view of the *Testan* court is consistent with the Court's prior holdings. Since *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the court has consistently defined property interests:

> Property interests are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlements to those benefits. *Id.; accord,*

---

**42.** There is no continuous on-site performance at Government facilities, integrated effort, or performance of comparable services. The Civil Service Commission, applying the Pellerzi standards, concluded, on a finding of the presence of many more factors than plaintiffs have attempted or succeeded in showing, that the contracts in question did not constitute personal service. 20 CCF 83, 106 (1974). (D.C.Cir. 1975).

**43.** Form or type of contract and use of a checklist in lieu of a formal memorandum in traditional form are not relevant to the existence of personal services contracts.

**44.** Significantly plaintiffs offered no proof that this is true. The ASPR in question does not require it. AR 235–5 offers at least three alternatives to in-house performance.

*Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Arnett v. Kennedy,* 416 U.S. 134, 151, 165, 94 S.Ct 1633, 40 L.Ed.2d 15 (1974); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 2078 n. 7, 48 L.Ed.2d 684 (1976).

These cases require a specific, objective, definite expression of the property interest, an abstract need or a unilateral expectation does not suffice. *E. g., Roth, supra* 408 U.S. at 577, 92 S.Ct. 2701. Plaintiffs cite only two sources even arguably creating their property interest, 5 U.S.C. § 7501(a), and 5 U.S.C. § 3502. Upon examination neither provides the interest they assert.

5 U.S.C. § 7501(a) protects a civil service employee from removal except for cause. It deals with removals from the competitive service for cause in adverse action proceedings rather than removal in a reduction-in-force as was the case here. *See Arnett v. Kennedy supra.* It protects a civil servant from removal in a reduction-in-force only if the reduction-in-force is a subterfuge. *See e. g., Fitzgerald v. Hampton,* 152 U.S.App. D.C. 1, 467 F.2d 755 (1972). Plaintiffs have not claimed that the reduction-in-force is in fact a subterfuge for an adverse action against them. In any event the rights conferred by 5 U.S.C. § 7501 are protected by the adverse action procedures of 5 C.F.R. Part 752. Neither the statute nor those regulations confer upon plaintiffs the right to employment during the existence of contracts entered into in violation of regulations. Neither so much as mentions contracts. And no court has held that statute or those regulations confer such an interest. In fact plaintiffs implicitly acknowledge that the property interest conferred by that statute and those regulations apply only to adverse actions and not to reductions-in-force. (Plaintiffs' Conclusions of Law P. 11).

■ The other property interest conferring provisions giving arguable support to a property interest are 5 U.S.C. § 3502 and the regulations thereunder, 5 C.F.R. Part 351. However, the property interest conferred by that statute and those regulations extend only to competing employees. 5

U.S.C. § 3502(a); 5 C.F.R. 351.401. A competing employee is a career, nonprobationary employee in the competitive civil service. 5 C.F.R. 351.404; 5 C.F.R. 351.203(a); *see also* 5 C.F.R. 2102(a)(1); 5 U.S.C. § 2101(1).

The property interest conferred here is in the nature of seniority rights among civil servants. Plaintiffs' claim is that they should have the right to compete for jobs held, not by civil servants, but by contractor employees. The reduction-in-force statute and regulations confers no such rights 5 U.S.C. § 3502; 5 C.F.R. Part 351.

Plaintiffs' property interest can be analogized to that of the respondent in *Tennessee v. Dunlap,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976). Respondent Billy Don Dunlap was a National Guardsman and a civilian "technician" of the Tennessee National Guard. *Id.* As a technician he was a full time civilian employee of the Tennessee National Guard. *Id.* The 1968 National Guard Technician's Act conferred upon Dunlap a property interest in his civilian employment so that he could only be terminated for cause. 32 U.S.C. § 709(e)(3). However, the act also provided that a technician who lost his status as a National Guardsman also lost his civilian technician's job. 32 U.S.C. § 709(e)(1). When Dunlap was denied reenlistment he lost his National Guard status. *Dunlap, supra* at 2100. As a result, he was terminated from his civilian technician's job. *Id.* Dunlap claimed, in essence, that the property interest created by 32 U.S.C. § 709(e)(3) entitled him to continued civilian employment absent cause, despite his loss of National Guard status. *See, Dunlap supra* at 2100–101. The court agreed that 32 U.S.C. § 709(e)(3) created a property interest for Dunlap but held that the interest it created was limited; the court held that Dunlap was properly terminated from his civilian employment despite subsection (e)(3)'s requirement that cause be shown *Id.* at 2101.

■ Plaintiffs' situation is similar. 5 U.S.C. § 7501 confers upon them a property interest and continued employment absent such cause for termination as would pro-

mote the efficiency of the service. Thus, if each plaintiff were being separated in an adverse action proceeding, that statute would protect them. *See Arnett v. Kennedy, supra.* Plaintiffs, however, are being separated in a reduction-in-force. Therefore, their protection is limited to seniority rights preventing their separation ahead of a more junior employee. So long as their seniority rights and veteran's preference among other Government employees is protected, their separation in a reduction-in-force is proper. 5 U.S.C. § 3502; 5 C.F.R. Part 351. As in *Dunlap* plaintiffs enjoy a property interest in their employment. But, as in *Dunlap*, that interest is confined to the limits prescribed by the statutes and regulations. Neither 5 U.S.C. § 7501 nor 5 U.S.C. § 3502 guarantee plaintiffs continued employment when contracts in violation of Army regulations or ASPR remain in force. *Cf. Dunlap, supra; see Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Plaintiffs' property interest does not extend that far.

The other regulations provide absolutely no property interest. They say nothing which would require retention of employees on the Federal payroll during the existence of contracts entered into in violation of regulations. The opinions of the Civil Service Commission's General Counsel generally proscribe contracts in which an employer-employee relationship is created between the Government and the contractor's personnel. But they do not grant a civil servant the right to remain on the rolls during the existence of such contracts.

OMB Circular A–76 confers no right to civil servants to remain upon the Government's rolls during contracts which do not comply with its requirements. ASPR XXII grants no retention rights to civil servants if the contracting officer makes an erroneous conclusion regarding personal services. Nor do the DOD Directives cited by plaintiffs or AR 235–5 confer rights upon civil servants to remain on the rolls if they are violated.

In short plaintiffs have pointed to no concrete, readily identifiable source for their property interest. The essence of their argument is that the court should combine all the civil regulations and statutes and create the interest for them, that they should, therefore they do, have a property interest. The court simply does not have the power to create the property interest for plaintiffs in that fashion. A property interest in continued employment during the existence of contracts which violate regulations could be created. However, the Army, the Civil Service Commission or the Congress must create it. The court cannot.

## V. PROXIMATE CAUSE AND LACHES

Although plaintiffs' claim is essentially equitable, there is an appropriate analogy in the tort requirement of proximate cause. Here, plaintiffs' assertion of harm is too remote to have been the direct or fairly foreseeable consequence of entering the contracts in question. The RIF here challenged flows from foreign policy and related Congressional and executive decisions rather than from the awarding of the contracts in question.

Alternatively, even if the requisites of proximate cause had been met, that is if the harm were direct and fairly foreseeable, plaintiffs' claim would be barred by the doctrine of laches. Laches is principally a question of inequity of permitting a claim to be enforced. As a reading of this opinion demonstrates a large number of intervening rights and responsibilities have arisen since the award of these contracts. Under the circumstances plaintiffs' delay until now in asserting any rights they might have fits within the definition of laches and precludes this court from granting the extraordinary relief sought.

## VI. EVEN IF THE CONTRACTING OFFICER'S JUDGMENT THAT THE CONTRACTS ARE FOR PERSONAL SERVICES IS ERRONEOUS, PLAINTIFFS ARE ENTITLED TO NO RELIEF

The essence of plaintiffs' claim regarding violation of ASPR XXII is that if the con-

tracting officer's judgment is in error, they are entitled to remain on the federal payroll. This argument is unsupported by the ASPR and is clearly erroneous.

The ASPR governs the relationship between the Government and contractor employees. The vice to be avoided is permitting the relationship to become an employer-employee relationship. ASPR 22–102.-1(a). Assuming such a relationship occurs, by either the contract documents or the administration of the contract, nothing in ASPR XXII suggest that federal employees must or should be kept on the payroll to remedy it. The remedy is obvious. When the vice is found remedy it. Correct the contract document if that is the source of the violation. Halt the practice during the administration of the contract if the practice is erroneous. Continued employment of civil servants to remedy contracting practices is no remedy at all. The practice or the document can continue unchecked, in plaintiffs' view, just as long as civil servants remain on the Government's rolls.

One final point must be made ASPR XXII neither mandates nor even suggests that the effort performed under a contract which violates its tenets must be converted to in-house performance. Plaintiffs no longer seek this as a remedy, and General Marshall testified that converting to in-house performance at this time would seriously disrupt and have a major negative impact upon a program vital to the national defense (TT 717).

If personal services were present—and the record demonstrates they are not—the remedy would be to direct correction of the questionable practices. Directing continued employment of civil servants is not a required, nor even a viable, alternative.

## VII. CONCLUSION

For the foregoing reasons plaintiffs' motion for a permanent injunction is hereby denied, the preliminary injunction dissolved, and the case dismissed.